[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-10794
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 28, 2010
JOHN LEY
CLERK

D.C. Docket No. 08-20776-CR-FAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LANCE LALL,
a.k.a. Trini,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 28, 2010)

Before TJOFLAT and COX, Circuit Judges, and KORMAN,[*] District Judge.

KORMAN, District Judge:

_____

[*] Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

Lance Lall appeals from a judgment, entered upon a jury verdict, convicting him of conspiracy to commit credit card fraud in violation of 18 U.S.C. § 1029(a)(2), (4), and (b)(2), possession of device-making equipment with intent to defraud in violation of 18 U.S.C. § 1029(a)(4), and aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and (2). Lall was sentenced principally to thirty months in prison. On this appeal, he challenges the denial of his motion to suppress evidence obtained after the police responded to an armed robbery targeting his bedroom. Specifically, he argues that incriminating statements he made at that time and in response to subsequent interrogation were not voluntary and that the physical evidence seized from his bedroom was derived improperly from his initial admission.

## I. Background

On November 8, 2007, North Miami Police Detectives Michael Gaudio ("Gaudio") and Fred Desir ("Desir") responded to an emergency call regarding an armed robbery at the home where the twenty-year-old Lall lived with his parents, Erroll and Hannah Lall, and his brother and sister, Joel and Anissa. Hannah, Anissa, and Joel were home when two masked men entered and demanded money. The robbers made statements indicating that Lance had money and equipment that was valuable, and searched the upstairs bedroom shared by Joel and Lance. The Lalls

2

were threatened with violence by the robbers, who eventually settled for a laptop computer belonging to Lance and the keys to the Ford Mustang owned by the father, Erroll, in which they made their escape.

Detective Gaudio testified that, after the police arrived at the Lall residence to investigate the crime scene, Joel indicated to him that Lance "was into credit card fraud and making ID's and stuff with the Internet." The two detectives determined that the bedroom shared by Joel and Lance was "the focus of this home invasion, whatever these criminals were looking for, they were looking for in his room." Lance then arrived home and was given *Miranda* warnings by the detectives in the front yard of the house. Gaudio testified that he told Lance, "my main concern was the home invasion, about who had done this to his family, you know, this was a pretty serious crime," and that Gaudio "needed to find out more information."

Gaudio then took Lance to the bedroom to, in his words, "try to collect any evidence that might help" and "[t]o develop any leads to who might have committed the home invasion robbery." Once in the bedroom, the door to the room was shut. Lall testified that there were four officers, including Detective Gaudio, in the bedroom with him, though Gaudio testified that only he and Detective Desir, and possibly one other officer, were in the room. Gaudio admitted, however, that Lall's father and other family members were purposefully excluded from the room and not

3

permitted to enter, despite objections from the family. Significantly, prior to entering the bedroom, Detective Gaudio told Lall and his family that any information Lall shared with the police would not be used to prosecute him.

Once inside the bedroom, Lall proceeded to show Detective Gaudio the equipment he used to commit identity theft and to explain how each device worked. Based on these admissions, Gaudio seized, *inter alia*, two "skimmers," which Lall used to capture account information from swiped credit cards and driver's licenses, and one "encoder," which he used to transplant that information onto new cards or licenses for fraudulent purposes.

While Detective Gaudio did not arrest Lall, he alerted the Secret Service to this evidence less than twenty-four hours after it was taken. Several days later, Gaudio called Lall and told him to come to the police station with his father. According to Lall, Gaudio told Lall's father that they would not need to be accompanied by a lawyer, and Gaudio testified at the suppression hearing that he again told Lall he "wasn't going to be charging him with any of this." While at the station, Lall was again given *Miranda* warnings, and proceeded to further "expound" on his initial statement. Lall was not aware at this time that Gaudio had already notified the Secret Service of the evidence originally taken. Ultimately, Lall was arrested by Secret Service and charged with the offenses of which he was convicted.

Prior to trial, Lall moved to suppress the statements made to Gaudio during the initial interrogation and the physical evidence seized from his bedroom. Lall argued that the statements, which provided the probable cause for the seizure of the physical evidence, were improperly obtained. After a suppression hearing, the district judge denied the motion to suppress. Specifically, he held that Lall was not in custody—a holding which obviated any *Miranda* violation—and that there was sufficient probable cause to seize evidence found in Lall's bedroom.

The case then proceeded to trial. At the conclusion of trial testimony, Lall renewed his motion to suppress the evidence and statements obtained by police on the night of the robbery. The motion was predicated on the claim that certain evidence had been withheld from him with respect to the issue whether the items seized from his bedroom were in plain view. More pertinent to the issues raised on appeal, Lall asked the judge to instruct the jury to disregard testimony concerning the statements made by Lall at the police station on the grounds that they were not voluntary. While Lall's pretrial motion to suppress did not encompass the latter confession, the district judge denied the motion on the merits after concluding that the content of the first and second confessions was essentially identical, and that "the legal issue involved [was] the same," stating that "it's the same thing except [Lall] is entitled to *Miranda* warnings, perhaps, if he goes to the station voluntarily. But it

5

doesn't really change anything."

## II. Discussion

The principal issue presented by this appeal is the voluntariness of Lall's statements to Detective Gaudio. Lall's challenge to the admissibility of those statements encompasses two separate yet interrelated arguments: first, that Gaudio's promises of non-prosecution prevented Lall from making a voluntary, knowing, and intelligent waiver of his *Miranda* rights; and second, that these promises rendered any subsequent confession by Lall involuntary and thus inadmissible. The U.S. Attorney argues that Lall freely and voluntarily confessed to committing identity and credit card fraud and explained to Detective Gaudio how his equipment facilitated the commission of those crimes. Moreover, he argues that Lall was not in custody at the time of the questioning, notwithstanding the fact that he was given the *Miranda* warnings. Consequently, he argues, it is immaterial whether Lall knowingly and voluntarily waived his *Miranda* rights. The same argument is repeated with respect to Lall's challenge to the admissibility of the second statement he made a few days later after he was summoned to the police station for additional interrogation.

A. The First Confession

1. *Miranda* Waiver

We begin with Lall's first confession made to Detective Gaudio on the night of the robbery. Before a suspect's uncounseled incriminating statements made during custodial interrogation may be admitted, the prosecution must show "that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *United States v. Beal*, 921 F.2d 1412, 1434 (11th Cir. 1991). In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court explained that a warning that statements could be used against the suspect would make him aware of the consequences of foregoing the right to remain silent. *Miranda*, 384 U.S. at 469. "It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of that privilege." *Id.* Two factors are relevant to whether a waiver of the privilege was voluntary, knowing, and intelligent:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the

7

> "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

Relying on *Hart v. Attorney General of Florida*, 323 F.3d 884 (11th Cir. 2003), Lall contends that the promises of non-prosecution made by Gaudio undermined the *Miranda* warnings he had initially been given. In *Hart*, we held that a suspect's waiver was not "voluntary, knowing, and intelligent" under the totality of the circumstances. *Id.* at 895. The suspect was advised of his *Miranda* rights and signed a form indicating that he wished to waive those rights. *Id.* at 893. While being questioned, the suspect asked one particular officer "what were the pros and cons, in her opinion, of hiring a lawyer." *Id.* at 894. The officer responded that one disadvantage would be that "the lawyer would tell Hart not to answer incriminating questions," and stated that "honesty wouldn't hurt him." *Id.*

We held that this latter statement "contradicted the *Miranda* warning" previously given to Hart:

> The phrase "honesty will not hurt you" is simply not compatible with the phrase "anything you say can be used against you in court." The former suggested to Hart that an

8

incriminating statement would not have detrimental consequences while the latter suggested (correctly) that an incriminating statement would be presented at his trial as evidence of his guilt.

*Id.*

By contradicting the *Miranda* warning that a suspect's statements can later be used against him, the officer in *Hart* was "misleading [the suspect] concerning the consequences of relinquishing his right to remain silent." *Id.* Consequently, Hart's "decision to waive his rights and confess was the product of [the officer's] deception and, as a result of her contradictory statements, he did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it." *Id.* (quoting *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991). Thus, the suspect's waiver "was not voluntary, knowing, and intelligent as required by *Miranda*." *Id.*

In this case, Detective Gaudio gave Lall the *Miranda* warnings on the front lawn of the house. Nevertheless, Gaudio testified that before he entered the bedroom, he told Lall that he was not going to pursue any charges against him. Just as in *Hart*, this representation contradicted the *Miranda* warnings previously given. Indeed, this advice was far more misleading than that given in *Hart*. Our holding there compels the conclusion that, as a result of Gaudio's statements, Lall "did not truly understand

9

the nature of his right against self-incrimination or the consequences that would result from waiving it." *Hart*, 323 F.3d at 895.

Moreover, as in *Hart*, the totality of the circumstances in this case also bolster Lall's challenge to the propriety of his interrogation. The record shows that during the interview with police, Lall was kept alone in his bedroom, isolated from his family, and told that the purpose of any questioning was to protect Lall's family from future harm. These undisputed facts, taken together with Gaudio's representations, compel the conclusion that Lall did not make a "voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel." *Beal*, 921 F.2d at 1434.

## 2. Custodial Interrogation

The U.S. Attorney argues that Lall was not in custody at the time of his interrogation and that compliance with *Miranda* was unnecessary. A suspect is only entitled to *Miranda* warnings when he is interrogated while in custody, because such circumstances are presumed to exert pressure on him to speak. *See Miranda*, 384 U.S. at 444. In determining whether a person was in custody, we look to whether he was physically deprived of his freedom in any significant way or if a reasonable person in the defendant's position would have understood that his freedom was so

10

restrained. "[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). Thus, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Accordingly, "[c]ourts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *Yarborough*, 541 U.S. at 663 (quoting *Stansbury v. California*, 511 U.S. 318, 332 (1994)); *see also United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006) ("No particular fact in the 'custody' analysis is outcome determinative—we simply weigh the totality of the circumstances.").

Whether a person was in custody is a mixed question of law and fact, and "we review the district court's factual findings on the matter for clear error and its legal conclusions *de novo*." *United States v. McDowell*, 250 F.3d 1354, 1361 (11th Cir.

11

2001) (citing *Moya*, 74 F.3d at 1119). The U.S. Attorney argues here that Lall was not in custody at any time during the night of the robbery, an argument that was accepted by the district judge, who found that "the Defendant was not in custody." This holding was not supported by any specific findings of fact, and our review of the record suggests that it would be unwise to resolve this issue without the benefit of such findings. Nevertheless, a remand for this purpose is unnecessary because we conclude that Lall's confession is inadmissible for other reasons.

3. The Due Process Clause

Even if Lall was not in custody in the technical sense (and thus *Miranda* warnings were not required), we would still be required to address the voluntariness of his confession. While the failure to comply with *Miranda* creates a presumption that a confession was not voluntary, an examination of the totality of the circumstances is necessary to determine whether the confession was actually voluntarily given. *See Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *see also Jarrell v. Balkcom*, 735 F.2d 1242, 1252 (11th Cir. 1984) ("[E]ven if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness."). While we give deference to the district court's factual findings, we review *de novo* whether, all circumstances considered, Lall's confession was

12

voluntary and therefore admissible. *See Miller v. Fenton*, 474 U.S. 104, 115(1986); *see also Housel v. Head*, 238 F.3d 1289, 1299 (11th Cir. 2001).

In *Bram v. United States*, 168 U.S. 532 (1897), the Supreme Court observed that "a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight." *Id.* at 542 (internal quotations omitted). In *Brady v. United States*, 397 U.S. 742 (1970), the Supreme Court explained that *Bram* suggested that "even a mild promise of leniency," though not "an illegal act as such," undermines the voluntariness of a confession "because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess." *Id.* at 754. Nevertheless, *Bram*'s suggestion of a per se rule that would render a confession involuntary if it was preceded by "any direct or implied promises, however slight," has been rejected by the Supreme Court. *See Fulminante*, 499 U.S. at 284-85. Instead, the issue of voluntariness must be determined by examining the totality of the circumstances. *Id.* The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary. *Lego v. Twombly*, 404 U.S. 477, 489 (1972).

While we look to the totality of the circumstances to determine the voluntariness of Lall's confession, a significant aspect of that inquiry here involves

13

the effect of deception in obtaining a confession. We begin by observing that the deception at issue here did not involve a misrepresentation of fact. Such misrepresentations are not enough to render a suspect's ensuing confession involuntary, nor does it undermine the waiver of the defendant's *Miranda* rights. *See, e.g., Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (police falsely told suspect that his cousin had implicated him); *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (police falsely stated that suspect's fingerprints were found at the crime scene); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) (police misrepresented the strength of the case against the suspect). Police misrepresentations of law, on the other hand, are much more likely to render a suspect's confession involuntary. *See, e.g., Henry v. Kernan*, 197 F.3d 1021, 1027-28 (9th Cir. 1999) (police stated to suspect "what you say can't be used against you right now"); *see also Hopkins v. Cockrell*, 325 F.3d 579, 584-85 (5th Cir. 2003) (officer assured suspect "that their conversation was confidential").

*United States v. Walton*, 10 F.3d 1024 (3d Cir. 1993), is particularly instructive. There, law enforcement officers met with a suspect on a park bench. *Id.* at 1027. The suspect was not in custody and *Miranda* warnings were never given. *Id.* During the conversation, an officer stated "I've known you for a long time. If you want, you can tell us what happened off the cuff." *Id.* at 1028. Because the term "off the cuff"

would have been interpreted by the suspect to mean that anything he said would not be used against him, *id.* at 1030, the Third Circuit concluded that the officer's assurance was sufficiently coercive to render the suspect's subsequent admissions involuntary. *Id.* at 1032; *see also United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005) ("Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, *or the making of a promise that induces a confession.*") (emphasis added), *cert. denied*, 549 U.S. 1087 (2006).

While *Walton* assessed the totality of the circumstances in determining the voluntariness of the suspect's confession, it emphasized that

> this does not diminish the significance of the promise itself; given the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances.

10 F.3d at 1030 (citation omitted); *see also Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987) ("Similarly, certain promises, if not kept, are so attractive that they render a resulting confession involuntary . . . A promise of immediate release or that any statement will not be used against the accused is such a promise.") (internal citations omitted). The *Walton* Court continued: "Given the circumstances, there was

15

no reason for Walton to disbelieve [the officer] that nothing he said would be used against him." *Id.* at 1030. Accordingly, it found that Walton's confession should not have been admitted at trial. *Id.* at 1032.

Judge Posner has provided a thoughtful basis for the holdings in cases such as *Walton*. In *United States v. Rutledge*, 900 F.2d 1127 (7th Cir. 1990), he observed that through promises of non-prosecution, "the government has made it impossible for the defendant to make a *rational* choice as to whether to confess—has made it in other words impossible for him to weigh the pros and cons of confessing and go with the balance as it appears at the time." *Id.* at 1129. Thus, "if the government feeds the defendant false information that seriously distorts his choice . . . then the confession must go out." *Id.* Speaking to the facts of the case before him, he continued:

> If the officers, fully intending to use anything Rutledge said against him, had said to him, "Tell us all you know about the drug trade, and we promise you that nothing you tell us will be used against you," then he would have a strong argument that any ensuing confession had been extracted by fraud and was involuntary. *Quartararo v. Mantello*, 715 F. Supp. 449, 460-61 (E.D.N.Y.), *aff'd without opinion*, 888 F.2d 126 (2d Cir. 1989). For in our hypothetical case the officers would have deflected Rutledge from weighing the pros and cons of confessing and going in the direction that the balance leaned. Alternatively, Rutledge could in our hypothetical case hold the government to its promise, and could do so whether or not the promise was fraudulent.

*Id.* at 1130.

As already discussed, Gaudio explicitly assured Lall that anything he said would not be used to prosecute him. Moreover, there is ample record evidence to support a finding that Gaudio's promise was deceptive. Lall testified that Gaudio told him he would not be charged for any statements or evidence collected on the night of the robbery, and this was corroborated by Gaudio's testimony at the suppression hearing. It is inconceivable that Lall, an uncounseled twenty-year-old, understood at the time that a promise by Gaudio that he was not going to pursue any charges did not preclude the use of the confession in a federal prosecution. Indeed, it is utterly unreasonable to expect any uncounseled layperson, especially someone in Lall's position, to so parse Gaudio's words. On the contrary, the only plausible interpretation of Gaudio's representations, semantic technicalities aside, was that the information Lall provided would not be used against him by Gaudio or anyone else. Under these circumstances, Gaudio's statements were sufficient to render Lall's confession involuntary and to undermine completely the prophylactic effect of the *Miranda* warnings Gaudio previously administered.

In reaching his decision to deny Lall's motion to suppress, the district judge stated that Gaudio's assurance of non-prosecution "doesn't bind the United States Government," and concluded that the promise was "not a lie. [Gaudio is] doing it

17

truthfully because he is a robbery detective. He's not acting for the Secret Service. That's the difference." The district judge also stated: "See, all of your arguments would make sense if the Secret Service Agent had gone to the home, if the Secret Service Agent had made promises, if the Secret Service Agent had told the defendant and his family just for corroboration, but he's an adult, to do that."

This statement clearly implies that, if the Secret Service had made the promise that Lall's confession would not be used to prosecute him, then such an assurance would have rendered the confession involuntary. An involuntary confession, however, is inadmissible in a federal prosecution even if it was improperly coerced by state law enforcement officers. Indeed, almost a half century ago, in *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52 (1964), the Supreme Court held that "the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law." *Id.* at 78. More specific to the present case, it held that if a witness was compelled to testify in a state proceeding, his testimony could not be used against him in a federal prosecution. *Id.*; *see also United States v. Balsys*, 524 U.S. 670, 683 (1998). Consequently, it is irrelevant whether the tactics used to obtain Lall's confession were employed by state or federal officials.

18

*Taylor v. Singletary*, 148 F.3d 1276 (11th Cir. 1998), does not hold to the contrary. In *Taylor*, we held that state officials were not bound by a written immunity agreement between the defendant, who was represented by counsel, and federal officials. *Id.* at 1280. The voluntarily-entered agreement, through which the defendant agreed to offer self-incriminating testimony in exchange for immunity, specifically stated: "This agreement is limited to the United States Attorney's Office for the Southern District of Florida and cannot bind other federal, state of [sic] local prosecuting authorities." *Id.* at 1278. Under the circumstances, we found that there was no basis for concluding that the statements made pursuant to the agreement were involuntary. *Id.* at 1281-82. Indeed, the express agreement "did not on its face bind state authorities," *id.* at 1284, because it "only obligate[d] the United States Attorney for the Southern District not to use the information, *and perhaps not to disseminate it to other law enforcement authorities*. 148 F.3d at 1284 (emphasis added). Moreover, we observed that "[t]here is no evidence that the United States Attorney so disseminated any information provided pursuant to the informal immunity agreement; Taylor only challenges the use of his Bancoshares testimony, which was a matter of public record." *Id.* at 1284 n.9. Thus, even though we found that Taylor's immunity agreement did not preclude state prosecutors from using his testimony, we strongly suggested that the agreement did not allow federal prosecutors to actively

19

turn over that evidence to state prosecutors. Indeed, the evidence obtained by the state prosecutor came from the testimony Taylor gave at the federal trial, which was a matter of public record.


B. The Second Confession

Lall's second confession, which was given to Gaudio at the police station several days after the robbery, is likewise inadmissible. Because Lall failed to move to exclude this statement in his pretrial motion to suppress, the threshold issue is whether the admissibility of the second statement was properly preserved for our review. "[A] defendant who fails to make a timely suppression motion cannot raise that claim for the first time on appeal." *United States v. Pope*, 467 F.3d 912, 918 (5th Cir. 2006). Motions to suppress illegally obtained evidence must be made prior to trial or such objections are deemed waived, Fed.R.Crim.P. 12(b)(3), though this waiver may be excused for good cause. *See Davis v. United States*, 411 U.S. 233, 249 (1973); *United States v. Taylor*, 792 F.3d 1019, 1025 (11th Cir. 1986).

Lall argues that he failed to move to suppress the second confession because he never received notice from the U.S. Attorney, prior to filing his suppression motion, that he intended to use the statement at trial. There is substantial evidence in the record to support this claim. The discovery response prior to the suppression

hearing made no mention of Lall's second confession. Indeed, the response included the entire police report prepared by Detective Gaudio, which did not discuss Lall's second confession at the police station because it had been prepared on a date prior to that interview. Additionally, Lall's attorney claims that he believed the second confession had been recorded by Gaudio at the police station and, if the U.S. Attorney planned to use the statement at trial, he would have received notice of any plan to introduce the recording. As Lall's attorney explained at trial:

> The problem for us is we thought that there was a recording of [the second confession]. I not only would have pursued a suppression motion, but I would have pursued more the recording issue. Mr. Lance Lall absolutely swore up and down to me from the beginning that there was a recording. Thus, I never expected it to come in unless I saw a recording. The detective said he's going to go look for the recording just on my request, to see if he could find a recording. Again, even with that, the Government never said, if he finds it we're going to introduce it or we plan to change our mind, or anything like that.

Indeed, Lall's attorney stated: "What we left it at the suppression hearing was I brought [the second confession] up. The Government didn't even know that it had been made."

The record of the suppression hearing confirms this representation; it demonstrates that when Lall's attorney first raised the second confession for purposes

21

of establishing Gaudio's ordinary practice of giving *Miranda* warnings, it was the

Assistant U.S. Attorney who objected on relevancy grounds:

> Q: The next day when you give [sic] the *Miranda* rights, you did give [Lall] the *Miranda* warnings on the second day when he comes [sic] to the police station?
>
> A: Yes.
>
> Q: And he signs the *Miranda* –
>
> [Government]: Objection. *What did or did not happen on the second day is not an issue here.*
>
> The Court: Overruled. You've got to give me the legal basis for the objection. No speaking objection.
>
> [Government]: Relevance.

(emphasis added). The fact that the Assistant U.S. Attorney argued that "[w]hat did

or did not happen on the second day is not an issue here" suggests clearly that the

second confession was not going to be offered at trial.

The record does indicate, however, that sometime after the suppression hearing,

perhaps immediately before the start of trial, Lall learned that the U.S. Attorney

planned to introduce the second confession as part of his case-in-chief. Specifically,

his opening statement appears to anticipate that both confessions would be

introduced, although he later objected unsuccessfully to the admissibility of the

22

second confession only on the ground that the prosecutor failed to comply with his discovery obligations under Fed.R.Crim.P. 16. While it is difficult to know what to make of all this, it is clear that the district judge could have properly denied Lall's motion to strike Gaudio's testimony regarding the second statement because the record indicates that Lall's attorney knew before trial that the second statement was going to be offered and made no objection when he learned of that fact, nor did he object to its admission when the testimony was initially offered at trial on the grounds that he argues here. Nevertheless, the district judge ultimately addressed the merits of the admissibility of the second confession on those grounds.

Thus, when Lall's attorney asked that the jury be told to disregard any testimony about the second confession, the district judge said that he wanted to know "why should the second statement be suppressed. What happened at the second statement?" Lall's attorney responded that both Lall and his father were "told by Detective Gaudio bring your son down [to the police station] on Saturday. Mr. Lall says, do I need to bring a lawyer, literally says do I need to bring a lawyer. The response at that point is, to him–he explains it very clear. He says, no, I am not going to turn this over to the State Attorney. I'm not going to pursue charges." Lall's attorney also stated that Lall was Mirandized at this interview.

The district judge then asked: "What does the Government wish to say

23

regarding it?  The second statement."  In response, the prosecutor did not contest the accuracy of the offer of proof and relied solely on the erroneous claim  that the issue of the second confession's admissibility was raised during the suppression hearing: "I don't know what to say, Judge, because we had a suppression hearing on the entirety of Lance Lall's statements and the entirety of the items that were taken from his bedroom, all of which already have been addressed."

The district judge ultimately denied the renewed motion to suppress the first confession and, regarding the second confession, stated to Lall's attorney: "Let's assume all of that were true and you could prove it . . . it doesn't matter.  If legally it's the same argument, what difference does it make?," and added that: "The content [of the second confession] is the same as the first," and "it's the same legal issue, second statement or first statement."  Based on this finding, the district judge denied the motion for an instruction directing the jury to disregard the second confession: "I'm going to reject the curative instruction. *What else did you want to preserve?*" (emphasis added).

This ruling by the district court is enough to preserve the issue for our review. As we held in *United States v. Crosby*, 739 F.2d 1542 (11th Cir. 1984):

> Appellants did not make a pre-trial motion to suppress the evidence of the suitcases as required by Fed.R.Crim.P. 12(b) and first raised this motion at trial. Under Rule 12(f) this

24

waived the issue, and the district court would not have abused its discretion under Rule 12(f) if it had denied the motion solely on the ground of appellants' non-compliance with pre-trial procedure. However, the district court did not rely solely on appellants' pre-trial omission, but rather heard argument on the motion to suppress. We thus consider the merits of the trial court's ruling.

*Id.* at 1548; *see United States v. Contreras*, 667 F.2d 976, 978 n.2 (11th Cir. 1982); *United States v. Hicks*, 524 F.2d 1001, 1003 (5th Cir. 1973); *see also United States v. Vasquez*, 858 F.2d 1387, 1389 (9th Cir.1988), *cert. denied*, 488 U.S. 1034 (1989). The circumstances here are comparable to *Crosby*. Indeed, the U.S. Attorney here did not argue below, and he does not argue now, that Lall waived his right to challenge the admissibility of the second confession by his failure to comply with Rule 12(b), or that he procedurally forfeited his objection by failing to properly object when Gaudio was asked to testify about the confession at trial. This provides an additional basis for not applying any waiver or procedural forfeiture rule. *See United States v. Cichon*, 48 F.3d 269, 275 (7th Cir. 1995) (holding that the defendant's failure to move to suppress statements as involuntary would normally constitute a waiver, "[h]owever, the government does not argue that the issue has been waived and therefore we shall not pursue the matter further"); *cf. Howard v. United States*, 374 F.3d 1068, 1073 (11th Cir. 2004) (holding that a procedural forfeiture during a

25

criminal prosecution would not preclude review in a collateral proceeding pursuant to 28 U.S.C. § 2255, because "the government is itself barred from raising that affirmative defense because of its own default"). Consequently, we consider the merits of Lall's challenge to the admissibility of the second confession.

The district judge found the substantive content of Lall's first and second confessions to be the same, as were the legal issues surrounding them, and stated that the second interview "doesn't really change anything." In his brief here, the U.S. Attorney's only response to Lall's argument is that he "stands by its arguments set forth" in his discussion of the admissibility of the first confession. Because of this concession, which is consistent with the district court's holding that the issues raised by the second interview are identical to the first, we conclude that Lall's confession at the police station was similarly the product of improper promises of non-prosecution and thus not voluntary. Indeed, the circumstances of the second interview may lean more heavily towards a finding that Lall's cooperation was involuntary. The interview took place at a police station rather than Lall's house, Gaudio told Lall's father that they not need bring a lawyer with them, and Gaudio's promises of non-prosecution came after he had already contacted federal officials and alerted them to the existence of the original evidence held against Lall. In effect, Gaudio was acting on behalf of the Secret Service.

C.  Physical Evidence

While a confession obtained in violation of *Miranda* is inadmissible, the physical evidence derived from such a confession is not subject to the *Miranda* exclusionary rule assuming the predicate for its admissibility can be satisfied without resort to the confession. *See Oregon v. Elstad*, 470 U.S. 298, 305-6 (1985); *Michigan v. Tucker*, 417 U.S. 433, 450 (1974). The rule is otherwise for evidence derived from an involuntary confession obtained in violation of the Due Process Clause. *Id.* In this case, we have found Lall's confession involuntary—a conclusion that compels the suppression of any physical evidence derived from it. The record is clear that the physical evidence seized from Lall's bedroom was the fruit of the coerced confession.

While there is an issue of fact as to whether the items were in plain view, even if the physical evidence was plainly visible, it was only subject to seizure if its "incriminating character [is] immediately apparent." *Horton v. California*, 496 U.S. 128, 136 (1990). "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if its incriminating character [is not] immediately apparent—the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citing *Arizona v. Hicks*, 480 U.S. 321(1987)) (internal quotations

and citation omitted).

The record clearly shows that Gaudio did not have probable cause to seize the physical evidence because he had no idea what this equipment was and could not have recognized it as incriminating evidence without the benefit of Lall's admission. In describing Lall's bedroom, Gaudio testified: "In the room it was a disarray. There was computer equipment about. It was in plain view, *not knowing what it was*, but it was there." (emphasis added). By his own admission, Gaudio lacked the ability to recognize which devices, if any, were used for conducting criminal activity. He testified during the suppression hearing: "I'm not a computer guy, I'm looking right at the stuff and I cannot tell you what an embosser was or a skimmer or anything at the time. [Lall] showed us what the items would be, that [the robbers] should have been looking for and should have taken were right here . . . And he explained what everything does." He further stated that Lall "handed me several, I mean, items, computer, electronic nature. I really don't know what they were at the time. Again, that's not my forte. I really don't know." Indeed, Gaudio admitted that while Lall was showing him the equipment, Gaudio "even contacted my normal partner who's computer savvy if you want to put it that way. I couldn't get a hold of him to see if he could help me out in describing some of this stuff that I was impounding." Regarding the machine used to emboss credit cards, Gaudio testified:

28

Q:  Now, you said the items were in plain view, but on the other hand, this what you call an embossing machine was covered up by books?

A:  No, I did not say they were covered by books. I said there were books on top of it. It's a square box as the Judge said maybe a foot-and-a-half, two feet, and books are stacked on top of it where you can see it.

Q:  In any event, you said you did know what it did?

A:  I couldn't tell you what it did.

Q:  You didn't see any criminal value to it?

A:  At the time, no. It didn't have a sign that said embossing machine on it, no.

Indeed, the district judge agreed that Detective Gaudio lacked the ability to recognize the items seized: "He doesn't know what the computer is, what the printer is, what an embosser is, skimmer." Consequently, without Lall's statements and cooperation, Detective Gaudio lacked probable cause to seize the devices as contraband, whether they were found in plain view or not, because their incriminating character was not "immediately apparent." *Horton*, 496 U.S. at 136.

*United States v. Smith*, 459 F.3d 1276 (11th Cir. 2006), to which the U.S. Attorney cites, does not compel a contrary conclusion. In that case, police officers were lawfully present within a home pursuant to a warrant authorizing a search for

29

drugs. A police dog alerted the officers to a lockbox, which, when opened, was found to contain child pornography that was subsequently seized under the plain view doctrine. The defendant sought to suppress the pornography on the grounds that the pictures, although pornographic, did not obviously involve minors and thus the criminality of the evidence was not "immediately apparent" to the police officers at the time it was taken. In rejecting this argument, we relied on the testimony of several witnesses, including the police officer who seized the photographs, that the girls in the photographs "looked extremely young, very very young," and that it was "obvious" that the girls were minors. *Id.* This testimony was corroborated by that of a detective with extensive experience investigating sex crimes and child abuse, who stated that "some of the females in the photos were clearly minors with one likely as young as eleven." *Id.* We held that the evidence was properly seized, stating that "[t]here is no rule of law which requires an officer to know with absolute certainty that all elements of a putative crime have been completed when he seizes an article which reasonably appears to be incriminating evidence." *Id.* at 1292.

Here, in stark contrast to *Smith*, Detective Gaudio never testified that he believed the seized equipment's criminal characteristics were immediately apparent. In fact, he testified entirely to the contrary, stating that he couldn't tell you what the devices looked like, what they did, or how they were used. When asked: "You didn't

30

see any criminal value to it?," Gaudio responded: "At the time, no." Unlike the officer in *Smith*, who made a reasonable determination regarding evidence that was obviously criminal in nature, Detective Gaudio did not have the slightest clue that the equipment was incriminating until Lall told him. Accordingly, *Smith* does not affect our decision in this case.

D. Harmless Error Analysis

The admission of evidence obtained in violation of *Miranda* is subject to harmless error analysis. *Hart*, 323 F.3d at 895. The same is true regarding an involuntary confession obtained in violation of due process. *Fulminante*, 499 U.S. at 1265. In order to find that an error was harmless on direct appeal, we must "declare a belief that it is harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). Here, the nature of Lall's statements and the physical evidence taken from his bedroom make it impossible to conclude that their admission was harmless beyond a reasonable doubt. The only other inculpatory evidence was the testimony of Sobrina Mathurin, a cooperating witness who claimed to have conspired with Lall to commit identity and credit fraud. Significantly, in his closing argument, the Assistant U.S. Attorney acknowledged the weakness of Mathurin's testimony and admitted to the jury that his case hinged on the evidence

31

directly obtained from Lall:

> Folks, if none of this [physical evidence] were here, none of this, and if Lance Lall's statements were not before you, I would tend to agree with defense counsel about the challenges that he lodged on Sobrina Mathurin's credibility, because, after all, what happens if you take away all this stuff and all of Lance Lall's statments? What are you left with? Sobrina Mathurin, not a real pretty witness and not a real strong case for the government.

We agree with this assessment.[1]

### III. Conclusion

The judgment of conviction is reversed and the case is remanded to the district court for further proceedings consistent with this opinion.

---

[1] Lall also argues that the district judge abused his discretion in denying Lall's motion to reconsider the suppression motion as it related to the first confession. That motion was predicated on Lall's claim that certain evidence had been withheld from him regarding the issue whether the physical evidence seized from his bedroom was found in plain view. Because we find that the incriminating nature of the items taken from the bedroom was not apparent, even if they were in plain view, we need not decide this issue.

COX, Circuit Judge, specially concurring:

I do not join Judge Korman's opinion for the court. I agree that Lall's first confession, given on the night of the home invasion, was involuntary, and that evidence of that confession and the physical evidence derived therefrom is inadmissible. The trial court's error in admitting this evidence was not harmless. Accordingly, I concur in the judgment. But I would not reach the issue of whether Lall's second confession, given to Detective Gaudio at the police station, was involuntary and inadmissible.

As Judge Korman's opinion notes, the second confession was not the subject of a pretrial motion to suppress. This confession, however, was not introduced at trial, though there is some brief discussion of it in Detective Gaudio's testimony. Gaudio testified that at the police station, Lall admitted that he had been involved in credit card fraud for over a year and he suggested that one of his clients in the illegal activity may have committed the home invasion. (R.4-66 at 249.) I have reservations about whether objections on constitutional grounds to the brief discussion of this second confession were properly preserved. And, if they were, I have reservations about the merits. In my view, however, we need not address these issues because the limited testimony admitted about the second confession does not render the admission of the first confession and the physical evidence derived therefrom harmless beyond

33

a reasonable doubt.

The admission of the first confession and the physical evidence at issue was error that implicates a constitutional right. So, in the harmless error analysis, we ask "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 1837 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). The record indicates that the erroneously admitted evidence was essential to the Government's case. After considering all other evidence introduced at trial, including the limited testimony about the second confession, I cannot conclude beyond a reasonable doubt that the inadmissible evidence obtained on the evening of the home invasion did not contribute to Lall's conviction. During cross examination, Gaudio made clear that the bulk of his testimony describing Lall's admissions was derived from statements made on the night of the home invasion, not from statements made at the police station:

> Q. You only prepared one report in this case?
> A. Yes.
> Q. And that was the report that the prosecutor showed you about a half an hour ago?
> A. Yes.
> Q. And is it fair to say that in that report you did not make any reference to anything that was discussed during the interview that took place at the police station?
> A. Correct.

Q. And the only information that you recorded in the report was information that you got on the night of the home invasion, correct?

A. Correct.

Q. And essentially, you've summarized that for us, correct, the contents of the report?

A. I told what happened, yeah.

(*Id.* at 269.) Gaudio's testimony regarding the second confession, while damaging to Lall, does little to support the elements of the charged offenses. So, even if this evidence were properly admitted, it would not render harmless beyond a reasonable doubt the erroneous admission of the first confession and the physical evidence derived therefrom. The "minds of an average jury" would have found the Government's case less persuasive if this evidence had been excluded. *See United States v. Gari*, 572 F.3d 1352, 1363 (11th Cir. 2009) (citation omitted). Thus I concur in the judgment of the court reversing Lall's convictions.