[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15736
Non-Argument Calendar
_____

D.C. Docket No. 4:16-cr-00022-RH-CAS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TARVELL JIOVON DOUGLAS,
a.k.a. Tarell Douglas,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(May 11, 2017)

Before HULL, JULIE CARNES, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Tarvell Jiovon Douglas pled guilty to charges stemming from his possession of drugs and a firearm, which were discovered pursuant to a traffic stop and questioning by a law enforcement officer. Douglas moved to suppress the statements he made to the law enforcement officer both before and after he was advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966). The district court held a hearing and suppressed the pre-Miranda statements that Douglas made but declined to suppress Douglas's post-Miranda statements. In his plea agreement, Douglas reserved the right to appeal the partial denial of his motion to suppress. After thorough review of the record and the parties' briefs, we affirm.

## I. BACKGROUND

The underlying facts are taken from the factual proffer accompanying Douglas's guilty plea, testimony elicited at the suppression hearing, and transcripts of the video recording of the traffic stop included in the record.

## A. The Traffic Violation

On February 1, 2016, at approximately 9:30 p.m., Douglas was riding in the passenger seat of a car driven by his ex-girlfriend, who was a county probation officer. The driver's thirteen-year-old son was in the back seat. Officer James Martinez, a member of the Tallahassee Police Department's Violent Crime Response Team ("VCRT"), pulled the car over for speeding (going 39 miles per

hour in a 30-miles-per-hour zone) and a "stop bar violation." Martinez initiated the stop near the parking lot of a Taco Bell restaurant.[1]

Officer Martinez walked up to the driver's side of the car where Douglas was a passenger. Officer Martinez and Douglas immediately recognized each other from Officer Martinez's off-duty shifts at nightclubs that Douglas would frequent. Officer Martinez said that he knew Douglas from "different instances ranging from drug investigation to public affray to just standing outside of the club talking to him." During their previous conversations, Officer Martinez would try to "push [Douglas] in the right direction" and tell him to "walk the straight line" and "knock off" the criminal activity he was involved in. Officer Martinez testified that there "were multiple previous occasions where I cut him loose with a warning for misdemeanor possession of marijuana."

## B.    Initial Conversation with Douglas During the Traffic Stop

After getting the driver's identification, Officer Martinez walked back to his car and got on his radio. Via the radio, Martinez told fellow officers that he knew Douglas was "out on bond right now" and was "[i]nvolved with drugs." Officer Martinez said he also "glance[d]" at Douglas's prior criminal history.

---

[1]According to Officer Martinez, the VCRT is a "gun suppression unit" that responds to high-crime areas in order to "suppress some of that activity." Members of the VCRT would all work together in the same area of town in order to support each other. Five other officers from the VCRT were also in the Taco Bell parking lot.

3

Officer Martinez then called for a K-9 unit, which is standard practice for the VCRT. Within four minutes of the stop, a police K-9 unit arrived and gave an alert for the presence of controlled substances in the car. At that point, officers handcuffed Martinez and the other occupants of the car, which is also standard practice for the police department.

Officer Martinez pulled Douglas aside and asked if Douglas had any "weed" on him and, if so, how much. Douglas replied: "That ain't none of their shit. That's [my] shit." At this point, Douglas had not been advised of his Miranda rights. According to Officer Martinez, he had not read Douglas his Miranda rights because their conversation had "nothing to do with interrogation" and was, rather, about Officer Martinez "scolding" Douglas. Officer Martinez testified that this initial conversation was "almost like a scolding of, 'What are you doing? We talked about this before. You're going to get these people in trouble.'"

Officer Martinez then told Douglas, "Know you . . . what she does for a living, what you could do to her?" Douglas again replied, "Ain't nothing theirs; all that's mine man." Martinez asked if Douglas was still out on bond, and Douglas affirmed that he was.

Douglas then told Martinez that he had a gun in his bag and asked that Martinez "let it slide." Officer Martinez responded, "It can't happen like that my man." Officer Martinez then asked Douglas, "[a]ny guns inside the car?" and

4

Douglas indicated there were.  According to Officer Martinez, he asked Douglas about weapons strictly for "officer safety reasons."  Officer Martinez stated: "[W]e're a gun suppression unit.  That's one of the first questions that we will ask."  Officer Martinez also stated that the VCRT asks "[a]nybody" they stop about gun possession.

## C.    <u>Miranda</u> Warnings

At that point, Officer Martinez told Douglas, "We're gonna do everything official anyways, ok?" and then read Douglas his <u>Miranda</u> rights.  Officer Martinez explained that he said this to "ceas[e] our conversations as us knowing each other personally" and mark the beginning of the suspect-officer relationship.

After reading Douglas his <u>Miranda</u> rights, Officer Martinez asked Douglas if "everything inside" the car belonged to Douglas.  Douglas said that the gun and drugs belonged to him.[2]  Officer Martinez asked where the gun was located, and Douglas responded that it was in a bookbag.

Officers searched the car and seized a black backpack that contained: (1) a digital scale with some marijuana and white powder residue; (2) plastic sandwich baggies; (3) a mason jar wrapped in duct tape containing three bags of marijuana;

---

[2]Later, however, Douglas claimed that the backpack belonged to his cousin, that Douglas had met his cousin earlier that day, and that he held onto the backpack for his cousin, knowing it contained drugs and a firearm.  Douglas said he was on his way to return the backpack to the cousin when they were pulled over.

5

and (4) a 9-mm pistol with a round in the chamber and an inserted magazine containing 14 rounds of ammunition.  Douglas also had $803 in cash on his person.

At the suppression hearing, Officer Martinez stated that at no time during the traffic stop did he "purposely and intentionally plan to get an admission" from Douglas and that he did not purposely and intentionally withhold Miranda warnings.  Officer Martinez also denied advising Douglas of his Miranda rights because he got admissions and then wanted to "reinforce those admissions" with further questions.

Officer Martinez said that, although he had been involved in "[t]housands" of arrests in his career, he had never before questioned a suspect, then given Miranda warnings, and then questioned the suspect again.  Martinez explained that "this was kind of an abnormal circumstance, because I actually knew him . . . . I had talked to Mr. Douglas . . . probably over a hundred times."

**D.    Douglas's Motion to Suppress and the District Court's Ruling**

A grand jury charged Douglas with: (1) possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(D) ("Count One"); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) ("Count Two"); and (3) possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) ("Count Three.").

6

Douglas moved to suppress the statements he made to Officer Martinez both before and after being advised of his Miranda rights.  At the May 23, 2016 suppression hearing, the district court heard testimony from Officer Martinez about the incident, viewed portions of the police surveillance video of the incident, and heard argument from both parties.  The district court then made a ruling from the bench that it would suppress any statements made before Douglas was read the Miranda warnings but that it would deny the motion to suppress with respect to statements Douglas made after the Miranda warnings.

The district court explained that, while "[t]he stop was essentially a pretext to check for guns," police officers are "perfectly entitled" to stop a car for committing a traffic violation, as happened here.  The district court explained that, as to the pre-Miranda statements, although Officer Martinez's "subjective intention may have been to follow up on what isn't quite mentoring but some good advice to stay out of criminal activity[,] . . . his subjective motivation is not the standard." Instead, "[t]he standard is what an officer should know; that is, some objective test. . . . Here, the questions and comments made by the officer were reasonably likely to elicit an incriminating response, and so that was a violation of Miranda."

The district court then turned its attention to Douglas's post-Miranda statements.  Citing the U.S. Supreme Court's decisions in Oregon v. Elstad, 470 U.S. 298, 105 S. Ct. 1285 (1985), and Missouri v. Seibert, 542 U.S. 600, 124 S. Ct.

7

2601 (2004), along with this Court's decision in United States v. Street, 472 F.3d 1298 (11th Cir. 2006), the district court explained that a defendant's post-Miranda statements are admissible unless the questioning officer "adopts [a] deliberate two-step strategy: sets out to inquire, gets statements that are un-Mirandized, and then give[s] Miranda warnings, then gets [the admissions] repeated." The district court then made the factual finding that an impermissible two-step strategy did not occur here, stating:

> Officer Martinez did not do that here. He did not start off intending to violate Miranda, to get statements and then to be able to use them after Mirandizing Mr. Douglas. I credit his description that he had some history with Mr. Douglas; that essentially he got him aside and said, "What are you doing?" It was interrogation that a reasonable officer would understand was likely to elicit an incriminating response, and so it was a questioning within the meaning of Miranda, but it was not a deliberate two-step strategy.
>
> . . .
>
> The defense points to a number of factors that cut toward a finding that there was a deliberate two-part strategy. My job is to analyze all of the facts and to decide -- analyze all of the circumstances and decide whether, in fact, Officer Martinez followed a deliberate two-part strategy. My finding of fact is that he did not.
>
> When I mentioned specific facts, it always runs the risk that somebody will think that that was the focus. It's not. But let me tell you one fact that does color my analysis of this.
>
> Mr. Douglas asked, "Can we let this one slide?" That kind of statement might be made in just the ordinary law-enforcement-suspect encounter; but, frankly, it seems to me that there is some history between these two, and it hasn't been entirely adversarial. It seems to me completely consistent with Officer Martinez's statement that, "I

8

tried to counsel him before to get away from this." And it's consistent with Officer Martinez's statements that he's been around misdemeanor amounts, and he had some discretion, and he cut Mr. Douglas slack. Mr. Douglas was asking for that again.

It seems to me that that's a very atypical relationship at the point of this kind of a stop. In these circumstances that led to an atypical interaction, questioning before <u>Miranda</u> warnings were given, different than Officer Martinez routinely does, different from hundreds, thousands of other arrests.

So aside from circumstances that are present almost every time -- that is, the defendant is in custody, officers have reason to believe he's committed this crime, they are obviously interested in getting incriminating information -- aside from those circumstances, there's not very much here to suggest that this is a deliberate strategy.

The district court then asked if the parties would like it to elaborate further or make any "subsidiary findings." Both parties declined.

The district court memorialized its ruling in a written order issued on May 30, 2016. On June 1, 2016, Douglas pled guilty to all three counts of the indictment, pursuant to a written plea agreement. The district court sentenced Douglas to a cumulative 66 months in prison. Douglas timely appealed. On appeal, Douglas only challenges the district court's partial denial of his motion to suppress.

## II. RELEVANT LAW: <u>ELSTAD</u>, <u>SEIBERT</u>, AND <u>STREET</u>

The Fifth Amendment mandates that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To guard against the risk of a coerced confession in violation of the Constitution's Self-

Incrimination Clause, the Supreme Court has concluded that "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." Miranda, 384 U.S. at 467, 86 S. Ct. at 1624. Informing a suspect of his or her Miranda rights and obtaining a waiver of those rights generally produces a "virtual ticket of admissibility." Seibert, 542 U.S. at 608-09, 124 S. Ct. at 2608 (plurality opinion).

As a general rule, the existence of a pre-Miranda statement does not require the suppression of a post-warning statement that was knowingly and voluntarily made. See Elstad, 470 U.S. at 309, 318, 105 S. Ct. at 1293, 1298. For example, in Elstad, the suspect confessed after being subjected to unwarned custodial interrogation at his house. Id. at 300-01, 315, 105 S. Ct. at 1288-89, 1296. After being read his Miranda rights several hours later at the police station, the suspect waived his rights and made a second full confession. Id. at 301, 105 S. Ct. at 1289. The Supreme Court concluded that the second confession was admissible because it was knowingly and voluntarily made. Id. at 318, 105 S. Ct. at 1298.

The Elstad general rule, however, is subject to the Seibert exception, which comes into play when police purposefully withhold Miranda warnings while interrogating a suspect in custody in order to obtain a full confession and then provide him with full warnings and get him to re-confess—the so-called "two-step" or "question first" strategy. Seibert, 542 U.S. at 605-06, 124 S. Ct. at 2606-

10

07; Street, 472 F.3d at 1313. Under these circumstances, "suppression of a post-warning confession is required if 'the two-step interrogation technique [is] used in a calculated way to undermine the Miranda warning.'" Street, 472 F.3d at 1313-14 (quoting Seibert, 542 U.S. at 622, 124 S. Ct. at 2616 (Kennedy, J., concurring)).[3]

"That means that if an officer employs a strategy of deliberately questioning an in-custody suspect without any Miranda warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession, the post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the Miranda decision intended." Id. at 1314. Curative measures are only necessary, however, where the two-step strategy has been used. Id. "Otherwise, the Elstad general rule that post-warning statements are admissible, even where they follow pre-warning statements that are not, governs." Id.

In determining whether law enforcement officers impermissibly used a "question first" strategy, this Court will consider the totality of the circumstances, including "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-

---

[3]As this Court has explained, "[b]ecause Seibert is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law." Street, 472 F.3d at 1313.

11

warning statements." Id. (quoting United States v. Williams, 435 F.3d 1148, 1159 (9th Cir. 2006)).

### III.  DISCUSSION

**A.    Whether the district court erred in applying the <u>Seibert</u> exception**

The first question we must address here is whether we review the district court's finding that Officer Martinez did not act with the "deliberateness" required to trigger the Seibert exception under a de novo or clear error standard of review. The parties agree that this Court has not explicitly taken a position on this issue. Douglas wishes us to review this issue as a mixed question of law and fact deserving de novo review, and the government responds that it is more correctly a factual question subject to the clear error standard. We need not decide this question today because the government prevails under either standard.

The district court did not err in finding that Officer Martinez did not employ an impermissible "two-step" interrogation tactic here. At the suppression hearing, Officer Martinez stated that, at no time during the traffic stop did he "purposely and intentionally plan to get an admission" from Douglas, nor did he purposely and intentionally withhold Miranda warnings. Officer Martinez also denied advising Douglas of his Miranda rights because he got admissions and then wanted to "reinforce those admissions" with further questions. Instead, the record evidence demonstrated that Officer Martinez first spoke to Douglas as a friend or

12

acquaintance, giving him a "scolding" about having drugs and a firearm.  Officer Martinez then transitioned to an officer-suspect relationship by telling Douglas, "[w]e're gonna do everything official anyways, ok?" and reading Douglas his Miranda rights.

These circumstances stand in stark contrast to the facts in Seibert: Having been awakened at 3:00 a.m., the suspect in Seibert was taken to the police station and systematically interrogated for 30 to 40 minutes without Miranda warnings about her role in a terrible crime resulting in a young teenager's death.  542 U.S. at 604-05, 124 S. Ct. at 2605-06.  The police officer conducting the interrogation made a "conscious decision" to withhold Miranda warnings and resorted to the interrogation technique he had been taught: question first, then give warnings, and then repeat the question to re-elicit an incriminating statement.  Id. at 604-06, 124 S. Ct. at 2606.  After the suspect made a crucial admission, she was given a break, Miranda warnings were administered, and the suspect was immediately confronted with her pre-warning statements in order to extract the more elaborate conforming admissions.  Id. at 605, 124 S. Ct. at 2606.

By contrast, there is no record evidence here to suggest that the Tallahassee Police Department had protocols, customs, or training that required officers to use a deliberate two-step interrogation technique.  Indeed, Officer Martinez testified that, of the "thousands" of arrests he had made in his career, this was the only

13

incident where he questioned first, then gave warnings, and then questioned again. He testified that the only reason he did so in this case was the "abnormal" circumstance of previously knowing and having a mentoring-type relationship with the suspect, Douglas.

Further, unlike the police officers in Seibert, the district court credited Officer Martinez's testimony that he did not "employ[] a strategy of deliberately questioning [Douglas] without any Miranda warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession." See Street, 472 F.3d at 1314. The record does not support Douglas's contention that Martinez "exploit[ed]" and "[c]apitaliz[ed]" on his friendship with Douglas in order to "induce[]" Douglas to make an unwarned confession. Rather, Officer Martinez expressly testified that he did not intentionally withhold Miranda warnings in order to get admissions from Douglas. And the district court found Officer Martinez's testimony credible.

Under the totality of the circumstances here, there is nothing to suggest that Officer Martinez used a "question first" strategy "in a calculated way to undermine the Miranda warning." See Street, 472 F.3d at 1313 (quoting Seibert, 542 U.S. at 622, 124 S. Ct. at 2616). Because the district court did not err in determining that the two-step strategy was not used here, the Elstad general rule applies. See id.

14

**B.     Whether Douglas's post-<u>Miranda</u> admissions were knowing and voluntary under <u>Elstad</u>**

Under <u>Elstad</u>, Douglas's post-<u>Miranda</u> statements were admissible so long as they were knowingly and voluntarily made.  See <u>Elstad</u>, 470 U.S. at 318, 105 S. Ct. at 1298.  In making this determination, "courts are not to presume that the existence of [an] earlier unwarned statement compelled the defendant to give another one, but instead should assume that ordinarily giving proper <u>Miranda</u> warnings removes the effect of any conditions requiring suppression of the unwarned statement."  <u>Street</u>, 472 F.3d at 1313.  While giving deference to the district court's factual findings, this Court reviews the voluntariness of a confession <u>de novo</u>.  <u>United States v. Lall</u>, 607 F.3d 1277, 1285 (11th Cir. 2010).

The parties appear to agree that the district court never made an explicit finding as to whether Douglas's post-warning statements were knowingly and voluntarily made.  Our review of the record confirms this fact.

However, the record also reveals that the district court was well aware of the <u>Elstad</u> ruling, referencing that case's "general rule" three times in its statements during the hearing.  That awareness, combined with its dispositive ruling denying Douglas's motion to suppress as to the post-<u>Miranda</u> statements, demonstrates that the district court made an implicit finding that Douglas's post-<u>Miranda</u> statements were made both knowingly and voluntarily.  See <u>United States v. $242,484.00</u>, 389 F.3d 1149, 1154 (11th Cir. 2004) (stating that this Court may infer "from a district

15

court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated"); see also United States v. Robertson, 493 F.3d 1322, 1334 (11th Cir. 2007) (inferring implied factual findings consistent with the judgment under review). Thus, we reject Douglas's argument that the district court "misinterpret[ed]" the correct legal standard.

We now turn to the question of whether, all circumstances considered, Douglas's post-warning statements were voluntary and, therefore, admissible. See Lall, 607 F.3d at 1285. Douglas argues, for the first time on appeal, that his post-warning statements were not voluntary.[4] Accordingly, we review this issue for plain error only. United States v. Grimes, 142 F.3d 1342, 1353 (11th Cir. 1998).

This Court focuses its voluntariness inquiry on whether the defendant was coerced into making the statements at issue. United States v. Thompson, 422 F.3d 1285, 1295 (11th Cir. 2005). That is, "relinquishment of the right [against self-incrimination] must have been voluntary in the sense that it was the product of a

---

[4]As the government points out, Douglas did not address the voluntariness of his post-warning statements in his written suppression motion or at the suppression hearing. Instead, despite the government's noting in its response that Douglas was "not challenging whether his Miranda waiver was intelligent and voluntary," defense counsel's presentation at the hearing focused on the applicability of the Seibert exception. What's more, defense counsel affirmatively stated at the hearing that he read the government's brief as "saying that the court needs to make a decision as to the voluntariness of the statement; and I would submit to the court that that's exactly what the Miranda decision . . . says that's not what the court should be doing." Finally, after a lengthy explanation of its ruling on the motion, the district court asked if there were any further explanation or "subsidiary findings" the parties would like it to make, and defense counsel declined.

16

free and deliberate choice rather than intimidation, coercion or deception." Id. (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992)).

We determine whether a statement was made voluntarily, and thus was "the product of an essentially free and unconstrained choice," by examining the totality of the circumstances. Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003) (quoting United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)). Among the factors we consider are "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Id. at 1253; see also Thompson, 422 F.3d at 1295-96 ("Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.").

Here, we readily conclude that the district court did not plainly err in its implicit finding that Douglas's waiver of his Miranda rights and his post-warning statements were given knowingly and voluntarily under the totality of the circumstances.[5] Douglas had not been detained for a long period of time when he gave his post-warning statements, Officer Martinez did not use physical force against him, and there was no evidence that the interrogation was hostile or

---

[5]Given this determination, we need not and do not address the government's additional arguments that Douglas waived the voluntariness issue by failing to preserve it in his written plea agreement or that Douglas invited the error.

17

threatening, or that the police offered or promised anything to Douglas. See Hubbard, 317 F.3d at 1253. Thus, there is nothing to suggest that Douglas's post-Miranda statements were anything but "the product of an essentially free and unconstrained choice." See id. at 1252.

Contrary to Douglas's arguments on appeal, there is nothing about his being questioned with other police officers nearby that suggests undue coercion, nor did Officer Martinez make "a thinly disguised threat to prosecute his girlfriend and her son if [Douglas] did not take responsibility for any drugs and concealed firearms. Rather, the record reveals that Douglas first admitted owning the drugs and firearm before Officer Martinez admonished him: "Know you . . . what she does for a living, what you could do to her?"

Accordingly, the district court did not err in denying Douglas's motion to suppress as to his post-Miranda statements.

## IV. CONCLUSION

For the foregoing reasons, the district court did not err in its partial denial of Douglas's motion to suppress, and we affirm Douglas's convictions and sentence.

**AFFIRMED.**