[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15677

_____

D.C. Docket No. 2:12-cr-00104-MHT-TFM-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANK J. TEERS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(December 2, 2014)

Before HULL and MARCUS, Circuit Judges, and TOTENBERG,[*] District Judge.

PER CURIAM:

Frank J. Teers appeals his convictions and 97-month total sentence for one

count of conspiracy to commit wire and bank fraud, in violation of 18 U.S.C.

_____
[*]Honorable Amy Totenberg, United States District Judge for the Northern District of
Georgia, sitting by designation.

§§ 1343, 1344, 1349, six counts of aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and three counts of aiding and abetting bank fraud, in violation of 18 U.S.C. §§ 1344 and 2.  After careful review of the entire record, and with the benefit of oral argument, we affirm Teers's convictions and sentences.

## I.  FACTUAL BACKGROUND

This case involves defendant Teers and his codefendants' scheme to obtain multimillion dollar loans from financial institutions under the false representations that one of the defendants controlled a large bond portfolio that could serve as collateral.  Through this scheme, the defendants obtained a loan of more than $60 million.  We discuss the facts of the scheme below.

### A.    The Conspirators

Paul Hulse, Sr., was the principal of the Cayman Island entity, G&H Holdings, Ltd. ("G&H"), and also controlled H&H Worldwide Financial Service, Inc. ("H&H"), a Texas corporation formed in January 2004.  Defendant Teers, a licensed securities trader at all times relevant to the offense conduct, served as Hulse's broker and set up various investment accounts for Hulse over the years. Teers worked at various Texas brokerage firms between 1992 and 2007, including at Tri-Star Financial during the time period relevant to this case.  Steven P. Mock was a Texas attorney who served as counsel to H&H and Hulse and also as a director of H&H.

2

## B.    The Scheme to Defraud Begins

Starting in 2003, Hulse attempted to secure loans from various lenders with the representation that he controlled a large portfolio of bonds that could serve as collateral.  Hulse, however, did not in fact own such a bond portfolio during the relevant period.  None of these prospective loans went through.  More than one of the loans fell through, at least in part, because Hulse never produced verification to the lender that he actually owned or controlled any bond portfolio.

Defendant Teers and Mock made multiple statements to the prospective lenders, including through letters and other documents, supporting Hulse's false representation that he owned a substantial bond portfolio.  For instance, Hulse faxed to one prospective lender seventeen pages of printouts from the Bloomberg system that appeared to include Teers's name as the original sender.  Brokerage firms use the Bloomberg system to obtain information about publicly traded securities, and Teers had access to Bloomberg and used it routinely.  The Bloomberg printouts related to eight of the nine bonds listed on a forged brokerage statement earlier sent to the lender by Hulse that purported to show G&H's ownership of nine bonds worth a total of $28 million.

## C.    The August 2005 Loan

Richard Crouch was an employee of the Federal Land Bank Association of South Alabama ("the Bank") in Montgomery, Alabama.  The Bank had hired

Crouch to head a project called Capital Markets of the South ("CMS"), an unincorporated joint venture of the Bank and four other land banks to make large loans. The documentation for loans that Crouch originated through CMS was all done in the name of the Bank.

In 2005, Hulse contacted Crouch and expressed interest in a line of credit in the $25 to 30 million range to use for acquiring and developing a property in the United States. Crouch traveled to Houston, Texas for a face-to-face meeting with Hulse. At the meeting, Hulse stated that he had a very significant bond portfolio, but he did not give an estimate of its value. Hulse proposed that the bonds would be used to secure the contemplated loan. Crouch admitted to Hulse that he did not have much experience using bonds as collateral for loans or otherwise and that he required "an education from somebody who understood about how [a lender] would use [the bonds]." Hulse stated that Teers was his broker and that he would set up an appointment for Crouch to meet with Teers.

The next day, Crouch met with Hulse and defendant Teers over breakfast. Teers told Crouch that he was Hulse's broker, that he and Hulse had been doing business together for almost ten years, and that he was very familiar with the bond market and how bonds worked. Although Teers did not give a specific dollar value of the bonds, Teers described Hulse's bond portfolio as "significant." Crouch understood Teers to be referring to a current bond portfolio. Crouch testified that it

4

mattered to him whether H&H had bonds, and he would not have pursued the loan if Teers had revealed that he did not then manage any money for Hulse.

Hulse and Crouch left the meeting together, and when Crouch asked for specifics as to the size of the bond portfolio, Hulse indicated that it was enough to cover the cost of a Canadian property that the men earlier had discussed, which Crouch knew to be worth $400 million.

Crouch subsequently emailed Hulse to discuss a potential $30 million line of credit. Crouch thanked Hulse and Teers for educating him on Hulse's business model and plans, and noted that H&H would be the borrower on the loan and would pledge land and government securities as collateral for the loan. Crouch's proposal stated that the lender did not expect the value of the bonds to fully secure the loan, but that the bonds pledged would need to produce income sufficient to cover the interest payments on the loan. Crouch also requested a detailed description that would help the lender understand the overall nature of Hulse's financial holdings and businesses. On March 17, Hulse responded by fax, describing how he first started investing in bonds ("March 2005 fax"). Hulse also faxed to Crouch a cash flow sheet indicating that the bond portfolio produced enough interest income to service the debt on the loan.

Crouch told Hulse that he needed Hulse's attorney to provide independent verification of up to $18 million in AAA-rated securities, including names and

terms.  On March 28, Hulse sent Crouch an email, attaching Bloomberg descriptions of the bonds.  That same day, Mock wrote a letter to Crouch stating that Mock was the senior trust officer for Hulse and Hulse's companies and that the transfer of bonds from the trust to H&H was permitted under the conditions of the trust agreements.  Crouch subsequently discussed the Bloomberg descriptions with defendant Teers, and Teers told him that they represented the bonds that could be used as collateral.  Crouch secured approval for the $30 million line of credit from the CMS banks contingent on $16 million in bonds being pledged as collateral.

Crouch had additional communications with defendant Teers before the Bank loaned the money to Hulse.  On August 18, 2005, Teers sent Crouch Bloomberg pages for multiple bonds and the signature page for the loan's Pledge Agreement, signed by Teers on behalf of Tri-Star, in three separate faxes.  Crouch thought the Bloomberg pages represented bonds that were going to be part of the collateral required by the Bank.[1]  Based on these documents, Crouch believed that the Bank's $16 million pledge requirement had been satisfied.  The loan was approved and the proceeds distributed in August 2005.  Prior to the loan approval, no one told Crouch that Hulse did not actually own any bonds.

---

[1]At trial, other testimony indicated that information from the Bloomberg system can confirm the existence of bonds but cannot confirm their ownership.

The loan proceeds of more than $22 million were used to create two accounts at Tri-Star, a collateral account and an operating account. On August 22, 2005, Teers used the $16 million in the collateral account to purchase bonds.

**D.    June 2005 Interview of Teers by IRS Agents**

Prior to the closing of the August 2005 loan, Special Agents from IRS Criminal Investigations interviewed defendant Teers on June 15, 2005, in connection with a tax fraud investigation of Hulse. Special Agent Paul Duncan testified that, during the interview, the agents showed Teers the account statement forged by Hulse showing G&H's ownership of $28 million in bonds and asked Teers about it. Teers denied having assisted in making the statement and denied knowing why Hulse was sending it to potential lenders.

The agents also showed Teers a list of bonds that the agents had received from one of the financial institutions from which Hulse had attempted to obtain a loan. Teers did not deny supplying the list of bonds, but stated that neither he nor Hulse claimed that Hulse owned the bonds. Teers instead claimed that the list showed the types of bonds that were available for purchase. Teers also denied having ever vouched for anything for Hulse.

Finally, Agent Duncan told Teers during the interview that he did not believe that Teers was being truthful; that prospective lenders were all saying that Hulse was representing to them that he owned the bonds; and that by representing

7

that Hulse owned the bonds, Teers could be committing bank and securities fraud. Teers did not disclose the fact that he had been interviewed by the IRS to either the Bank or Tri-Star.

### E.    The December 2005 Loan

In October 2005, Hulse approached Crouch about taking out a second loan of approximately $60 million to purchase a coal property in Western Kentucky, again using bonds as collateral. That month, Hulse faxed Crouch a document claiming that the second loan would be used to purchase the property, provide working capital, and finance site development and expansion ("October 2005 fax"). This fax did not indicate that the second loan would be used to buy bonds. Additionally, in November 2005, Hulse faxed to Crouch another document representing that the second loan would be used for the purchase of property, approvals, engineering, marketing, administration, consultants, and working capital ("November 2005 fax"). This fax did not indicate that the loan proceeds would be used to purchase bonds. Crouch recommended and received the necessary approvals for the second loan, and in December 2005, the Bank made the second loan, totaling around $68 million. The second loan, which paid off and took the place of the first loan, contained an Amended Pledge Agreement, signed by defendant Teers on behalf of Tri-Star, providing that the bond portfolio serving as collateral needed to be large enough to cover the interest payments on the loan.

After the second loan proceeds were disbursed, defendant Teers used around $20 million of the funds to purchase the bonds that were added to the initial $16 million in collateral account. Put simply, the collateral didn't exist at the time the loans were made. Instead, loan funds totaling about $36 million were used to purchase the bonds that had been pledged as collateral for the loan itself.

Summary charts, admitted into evidence, show that Hulse, Teers, and Mock personally benefitted from the loan proceeds. Specifically, Hulse spent more than $2 million of the money, including to make cash transfers to his checking account, pay off loans, purchase a home and vehicles, to pay family members, and to purchase vacations, jewelry, antiques, and other luxury goods.

Teers profited primarily through commissions, with Tri-Star receiving approximately $1.1 million in commission on the purchase and sale of bonds for H&H. Teers's share of the commission was more than $590,000. Additionally, in February 2006, H&H paid more than $900 for plane tickets for Teers and his wife to visit Las Vegas. In September and October 2006, H&H wrote Teers checks totaling $4,500. Following the first loan, Mock received $50,000 in the form of checks payable to him and to a car dealer. Mock was also put on H&H's payroll and, from October 2005 through October 2007, received payments totaling more than $100,000.

## F.    Post-Loan Activities

By the spring of 2007, a dispute arose between H&H and the Bank regarding whether H&H could use the interest and the principal of the bonds to make the quarterly loan payments ("interest plus"), thereby "cannibalizing" the collateral, or whether, as the Bank contended, H&H could use only the interest from the bonds to make the payments. Although the Bank consented to H&H making its April 2007 payment using interest plus, the Bank decided that H&H would be required to make the July 2007 payment with interest only and communicated this decision to H&H.

On June 26, 2007, Teers, Mock, and Hulse joined a conference call to discuss the issue with the representatives of the Bank, including its president and CEO, Douglas Thiessen. In an effort to convince the Bank to allow H&H to use the principal of the bonds to make the next loan payment, Hulse claimed that he was on the "front door" of refinancing the loan in a transaction with another lender that would pay the Bank off in full. Hulse also stated that "he had never cannibalized a pledged account of the hundreds that he had had," prompting Teers to state, "well, not hundreds, but several."

At the conclusion of the conference call, the Bank agreed to entertain a proposal by H&H to make an interest plus payment on July 1, so long as the proposal specified the status of the possible refinancing and itemized how the loan

10

proceeds had already been used.  The parties also agreed that H&H would disclose the potential refinancing lender if the Bank executed a non-disclosure agreement.

Accordingly, that same day, Mock faxed to the Bank a proposed non-disclosure agreement, and on June 27, 2007, CEO Thiessen signed and faxed the non-disclosure agreement back to H&H ("June 2007 non-disclosure agreement"). Then, on June 28, 2007, Mock sent a letter with exhibits to the Bank, signed by Hulse, confirming that H&H was completing a new loan transaction with Wells Fargo's Energy Division[2] and that H&H had used the loan proceeds only to purchase properties and develop properties and to further develop H&H affiliated organizations ("June 2007 letter").  The explanation of H&H's use of the loan proceeds gave no indication that the proceeds actually had been used to purchase the bonds that were pledged as collateral.

The Bank rejected the proposal, refusing to accept an interest plus payment for July 1.  Within days, civil litigation commenced.

## II.  PROCEDURAL HISTORY

### A.    The Indictment

The indictment charged Teers, Hulse, and Mock with conspiracy to commit wire and bank fraud (Count 1), aiding and abetting wire fraud (Counts 2-7), and aiding and abetting bank fraud (Counts 8-10).

---

[2]Testimony by a Wells Fargo representative established that, although Hulse had approached Wells Fargo about a possible loan, the parties never came close to closing a loan.

As relevant to the issues on appeal, with regard to the aiding and abetting wire fraud charges, the indictment alleged that, to execute the scheme to defraud, Teers, Hulse, and Mock transmitted by means of wire communications the following: (1) in Count 2, the March 2005 fax from Hulse to Crouch; (2) in Count 5, the October 2005 fax from Hulse to Crouch; (3) in Count 6, the November 2005 fax from Hulse to Crouch; and (4) in Count 7, the June 2007 non-disclosure agreement faxed from the Bank to Mock.  Count 10, for aiding and abetting bank fraud, charged that Teers, Hulse, and Mock executed the scheme by way of Hulse and Mock signing and delivering the June 2007 letter to the Bank.

Additionally, the indictment alleged three material misrepresentations by defendant Teers: (1) in March 2005, Teers told Crouch during the breakfast meeting that he managed a "substantial" bond portfolio for Hulse ("March 2005 misrepresentation"); (2) in August 2005, in signing the Pledge Agreement for the first loan, Teers failed to disclose to the Bank that H&H owned no bonds and intended to use the loan proceeds to buy the bonds being pledged as collateral ("August 2005 misrepresentation"); and (3) in December 2005, in signing the Amended Pledge Agreement, Teers failed to disclose to the Bank that H&H did not own any bonds (other than those previously purchased with the first loan proceeds) and would be able to acquire the additional bonds being pledged as

collateral only by using the second loan proceeds ("December 2005 misrepresentation").

## B.    Teers's Motion to Suppress Statements

Prior to trial, defendant Teers moved to suppress statements he made during two interviews with IRS special agents.  Teers argued that his Fifth Amendment right against self-incrimination was violated when IRS agents questioned him during an investigation of Hulse without first advising him of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).  Teers asserted that the agents interrogated him as both a witness and a suspect in the ongoing criminal fraud investigation concerning Hulse and, during the interrogation, accused Teers of committing bank fraud.  The government filed a response to the motion to suppress.  The magistrate judge held a two-day suppression hearing on Teers's motion.

### 1.    Suppression Hearing Testimony

IRS Special Agent Michael Caldwell testified that he interviewed Teers in February and June of 2005 after Teers's name "came up" during an investigation of Hulse for possible violations of Title 26, the tax code.  In his position, Agent Caldwell investigated only Title 26 cases.  Prior to both interviews, Agent Caldwell called Teers on the telephone to arrange the interviews.  Agent Caldwell did not recall specifically the substance of his telephone conversations with Teers,

13

but he did not indicate that Teers was in trouble in any way and did not threaten Teers with a summons if Teers did not appear for an interview willingly. Generally, when arranging interviews, Agent Caldwell would identify himself to the witness as an agent working for the criminal investigation unit of the IRS, let the witness know that he wanted to discuss a case, and inform the witness that he could hold the interview either at the IRS office or at the witness's location.

Teers's interviews took place at the Houston IRS building, which Teers had to pass through security to enter. After passing through security, however, Teers would have been permitted to go from the first floor to the IRS's tenth-floor office unescorted. The IRS agents conducted interviews in an area of their floor that was unlocked and open to the public. Teers would have been free to come and go as he pleased from the area of the floor where the interview room was situated. For both interviews, Teers was not physically brought into the IRS office, he was not handcuffed or restrained in any way during the interviews, and he was free to leave for any reason.

Agent Caldwell's first interview with Teers was on February 16, 2005. Agent Caldwell was joined by Agent Duncan, as well as a third agent, and the interview lasted an hour and ten minutes. The agents did not give Teers a Miranda warning at the beginning of the interview and did not record the interview. Agent Caldwell considered Teers only a witness and not a suspect. He did not find

14

helpful any of the information provided by Teers, but he had no indication that Teers was not being truthful during the interview and no indication that Teers himself was involved in any criminal conduct.

Agent Caldwell and Agent Duncan interviewed Teers for the second time on June 15, 2005.  This interview lasted around an hour and a half.  At the second meeting, Agent Caldwell did not advise Teers of his Miranda rights.  Agent Caldwell did not believe that he needed to provide Teers Miranda warnings because Teers was not in custody and was not the subject of an investigation.  But he did inform Teers that he worked in the criminal division of the IRS, as he always does at the beginning of an interview.  Again, Agent Caldwell did not suspect Teers of any criminal activity and did not consider Teers to be in custody, but he believed that Teers might have information relevant to his investigation of Hulse.

Following the earlier interview of Teers, however, Agent Caldwell had become aware that Teers was providing lists of bonds to Hulse.  During the June 2005 interview, Teers admitted that he had provided the lists of bonds to Hulse.  Agent Duncan told Teers that by going around to various financial institutions and representing that Hulse owned the bonds, he was possibly committing bank fraud and securities fraud.  From Agent Caldwell's perspective, however, Teers did not become a suspect when Agent Duncan made the comment about Teers possibly

15

committing bank or wire fraud. Teers responded to Agent Duncan's comment by stating that he was not telling the different institutions that Hulse owned the bonds.

Agent Caldwell did not provide any information that he received from Teers, during his investigation of Hulse, to other law enforcement agencies. Agent Caldwell was not working with the Federal Bureau of Investigation ("FBI") at any time with regard to his Hulse investigation. In fact, it was more than three years after the June 2005 interview before Agent Caldwell became aware that the FBI was investigating Hulse, Teers, and Mock for bank and wire fraud.

Teers, on the other hand, testified that he felt compelled to come to the IRS office for both interviews. According to Teers, the IRS agent who called to set up the interviews told him that either they could meet at the IRS office or his location or a summons would be issued to compel his presence at the IRS office. Teers was never told during either interview that he was free to leave, and he did not feel free to leave. As to the June 2005 interview, the tone of the entire interview was "accusatory." On cross-examination, Teers conceded that he was never told he was under arrest, was never handcuffed, and was never told that he could not leave.

2. Magistrate Judge's Rulings

During the direct examination of Agent Caldwell, Teers, through his counsel, questioned Caldwell concerning the specifics of Caldwell's investigation of Hulse. Agent Caldwell testified that it was a Title 26 investigation, but stated

16

that he could not provide any further details on the Hulse investigation "due to disclosure."[3]  Agent Caldwell did confirm that the "things" for which he was investigating Hulse did not "have anything to do with what [Hulse] was subsequently indicted for in this case."  Teers asserted that he had a constitutional right to examine Agent Caldwell further concerning the investigation of Hulse, but the magistrate judge determined that the details were irrelevant because the investigation was not related to the indictment in this case.

Teers also tendered the IRS's manual for agents concerning criminal investigations.  Teers asked Agent Caldwell whether he was familiar with the manual, and Caldwell testified that he was.  Teers's counsel then questioned Agent Caldwell about the application of certain manual provisions—regarding when to give Miranda warnings to witnesses and suspects—to the interviews of Teers.  Agent Caldwell testified that he considered Teers to be a witness in an IRS investigation who participated in a non-custodial interview within the meaning of the manual.  The government objected to the line of questioning on relevancy grounds, and the magistrate judge sustained the objection, noting that it was for him to decide, based on constitutional and federal case law, whether Miranda had been violated.  Although suggesting that the IRS regulations were irrelevant, the

---

[3]The government attorney noted for the record that, as "an IRS agent, there are specific things [Agent Caldwell] can and cannot testify about.  He can't talk about the subject matter of an investigation, and he can't disclose things that are subject to grand jury or confidential informant. . . . He just cannot get into the specifics of the case."

17

magistrate judge permitted Teers to argue the relevancy of the IRS manual, admitted the manual for purposes of the record, and noted that Teers would be permitted to argue the issue and cite relevant authority.  Subsequently, the magistrate judge permitted Teers's counsel to make a closing argument in which he argued the relevancy of the IRS manual based on case law and the application of the IRS manual to the interviews of Teers.

3.    Report and Recommendation

Following the suppression hearing, the government filed a supplemental response, and Teers replied.  Teers argued that the IRS agents should have advised him of his Miranda rights during the interview under both the Constitution and the IRS policy manual as both a suspect and a witness.  Teers also contended that the magistrate judge abused his discretion in not allowing him to examine Agent Caldwell about the specifics of his investigation of Hulse to establish that Teers was a suspect.

The magistrate judge issued a report recommending that Teers's motion to suppress be denied.  The magistrate judge found that Teers was not entitled to be advised of his Miranda rights because he was not in custody during either IRS interview, such that his Fifth Amendment rights were not violated.  The magistrate judge did not address Teers's argument that he was denied due process by the agents' failure to comply with the IRS policy manual.

18

4.      District Court's Order

Teers filed objections to the magistrate judge's report, reiterating that he was entitled to <u>Miranda</u> warnings under either the Constitution or the IRS policy manual as a suspect or a witness. Teers also asserted that the magistrate judge abused his discretion in limiting his examination of Agent Caldwell. The district court overruled Teers's objections, adopted the magistrate judge's report, and denied Teers's motion to suppress.

## C.      Trial

After Hulse pled guilty, Teers and Mock went to trial in May 2013. At the close of the government's case, Teers filed a written motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, and also moved orally for judgment of acquittal, arguing that the government had presented insufficient evidence as to all ten counts of the indictment. The district court denied the motion. After Teers rested, he renewed his Rule 29 motion for judgment of acquittal as to all charges. The district court denied the motion.

The jury found both Teers and Mock guilty of all charges in the indictment.

## D.      Sentencing

The presentence investigation report ("PSI") recommended a base offense level of seven for Teers pursuant to U.S.S.G. § 2X1.1(a). The PSI added to that base offense level: (1) a 28-level increase because the intended loss was $350

19

million, which was greater than $200 million but less than $400 million, pursuant to U.S.S.G. § 2B1.1(b)(1)(O); (2) a two-level increase because the offense involved ten or more victims, pursuant to § 2B1.1(b)(2)(A); (3) a two-level increase because the offense involved sophisticated means, pursuant to § 2B1.1(b)(10)(C); (4) a two-level increase because Teers derived more than $1 million in gross receipts from one or more financial institutions, pursuant to § 2B1.1(b)(15)(A); and (5) a four-level increase because Teers was a registered broker and the offense involved a violation of the securities laws, pursuant to § 2B1.1(b)(19)(A).  With an adjusted offense level of 45, Teers's total offense level became 43, the maximum offense level under the guidelines.

Based on his total offense level and criminal history category of I, Teers's advisory guidelines range was life imprisonment.  Because the applicable statutory maximum was 30 years, the advisory guidelines range became 360 months.  Teers raised numerous objections to the PSI, including to, in relevant part, the loss calculation, the number of victims, the PSI's failure to award a "minor participant" reduction, and the increase for sophisticated means.  Teers also requested a downward departure and a downward variance.

The district court held a three-day sentencing hearing.  CEO Thiessen testified that fifteen institutions participated in the loan to H&H.  Because an

institution like the Bank could not bear a $68 million loan on its own, the normal practice for such a financial institution was to participate out a portion of the loan.

The district court overruled Teers's objections to the number of victims and to the lack of a minor role reduction. The district court found that, under the circumstances of the case, actual loss of $31,280,414 as opposed to intended loss of $350 million was the appropriate figure to use for calculating the guidelines range. The district court also sustained Teers's objections to the remaining enhancements based on sophisticated means, a violation of securities laws, and gross receipt of more than $1 million.

As a result, the district court calculated a total offense level of 31, which with a criminal history category of I, resulted in an advisory guidelines range of 108-135 months' imprisonment. The district court varied downward and sentenced Teers to 97 months' imprisonment as to each count, all sentences to run concurrently.

### III.  MOTION TO SUPPRESS

In reviewing the district court's denial of a motion to suppress, we review the court's findings of fact for clear error and its application of law to those facts de novo. United States v. Yeary, 740 F.3d 569, 579 n.25 (11th Cir. 2014). We construe all facts in the light most favorable to the party that prevailed in the district court and afford substantial deference to a factfinder's credibility

determinations.  United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012).  We accept the factfinder's choice of whom to believe "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (quotation omitted).  Thus, we defer to the district court's factual determinations unless the district court's understanding of the facts is "unbelievable."  Id. (quotation marks omitted).

"The admission of statements obtained in violation of Miranda is subject to harmless error scrutiny.  The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."  United States v. Arbolaez, 450 F.3d 1283, 1292 (11th Cir. 2006) (quotation omitted).  In making this determination, we consider the effect of the erroneously admitted statements upon the other evidence introduced at trial and upon the conduct of the defense.  Id. at 1293.

## A.    Fifth Amendment Violation

Teers argues that the district court erred in denying his motion to suppress based on a violation of his Fifth Amendment rights by the interviewing IRS agents in failing to give him Miranda warnings.  He contends that the evidence at the suppression hearing showed that he was in custody during the IRS interviews for purposes of Miranda.

22

The Fifth Amendment provides individuals with a right against self-incrimination.  U.S. Const. amend. V.  In <u>Miranda</u>, the Supreme Court held that the government may not use a defendant's statements elicited during a custodial interrogation against that defendant unless officials provide specific warnings concerning the defendant's rights against self-incrimination beforehand.  384 U.S. at 478-79, 86 S. Ct. at 1630.

Thus, the trigger for <u>Miranda</u> protections is custody.  For purposes of <u>Miranda</u>, a person is in custody if, under the totality of the circumstances, a reasonable person would believe the restraint on his freedom of movement has been curtailed to the degree associated with a formal arrest.  <u>United States v. Lall</u>, 607 F.3d 1277, 1284 (11th Cir. 2010).  "Whether a person was in custody is a mixed question of law and fact, and we review the district court's factual findings on the matter for clear error and its legal conclusions <u>de novo</u>."  <u>Id.</u> (quotation marks omitted).

In assessing whether a reasonable person in Teers's position would have understood his freedom of movement to have been curtailed to the degree associated with a formal arrest, "we consider the totality of the circumstances, including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and length of the detention."  <u>United States v.</u>

23

Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (citation and quotation marks omitted).

Relevant to this case, the Supreme Court has recognized that Miranda warnings are not required merely because law enforcement members question an individual in the police station or because the questioned person is one whom the police suspect. California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983). "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Id. at 1124, 103 S. Ct. at 3519 (quotation and alteration omitted). Thus, "a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment." Id. (quotations omitted).

In this case, the parties do not dispute that Teers was not provided Miranda warnings during the February and June 2005 interviews and disagree only as to whether he was in custody at the time of the interviews. We find no error in the district court's determination that Teers was not in custody at the time of the interviews. Viewing the facts in the light most favorable to the government, the evidence showed that Teers voluntarily appeared at the IRS office for both

interviews, and the IRS agents never brandished their weapons, physically touched or restrained Teers, told him that he was not free to leave, or told him that he was under arrest or the subject of a criminal investigation. Under the totality of the circumstances, a reasonable person in Teers's position would not have believed that his freedom of movement was restrained to the degree of an arrest. See Lall, 607 F.3d at 1284. Although Agent Duncan at one point warned Teers that he might be committing securities or bank fraud by presenting the bond listings in a manner that suggested Hulse owned the bonds, Agent Caldwell interviewed Teers both times as a witness and did not consider him a suspect. Furthermore, while Teers testified that he felt compelled to appear for the interviews, he did not feel free to leave, and the June 2005 interview had an "accusatory" tone, on appeal Teers has offered no reason that we should not defer to the magistrate judge's finding that Agent Caldwell was credible and Teers was not. See Lewis, 674 F.3d at 1303; Ramirez-Chilel, 289 F.3d at 749.

## B.    Violation of IRS Manual

Alternatively, Teers contends that the interviewing agents violated his due process rights in failing to follow the IRS policy manual on interviewing suspects and witnesses and that the district court should have granted his motion to suppress on that ground. Thus, the first issue we consider is whether the IRS agents violated the policy manual in this case, and the second is whether suppression of evidence

25

in a criminal case is an appropriate remedy for such a violation, even when the violation is non-constitutional. We first review the IRS policy manual.[4]

As included in this record, the IRS Manual provides, in section 9.4.5.11.3.1, titled "Informing of Constitutional Rights in Non-Custodial Interviews," that "[t]he special agent will advise the individual of his/her constitutional rights <u>during non-custodial interviews</u> when the individual is <u>a subject of an investigation</u>, a corporate officer or employee who appears to be implicated in an alleged wrongdoing involving a corporation under investigation, or <u>when a witness' statement would incriminate the witness</u>" (emphasis added). The manual also provides in section 9.4.5.11.3.1.4, titled "Witnesses," that agents shall "[a]dvise the witness of constitutional rights if at any time the witness makes statements that tend to incriminate him/her."

Defendant Teers primarily claims he was "a suspect" (i.e., "a subject of an investigation") within the meaning of the policy manual and thus the IRS agents violated the manual by not advising him of his <u>Miranda</u> rights. Teers contends that a factfinder could reasonably infer from Agent Caldwell's testimony that he was the subject of a criminal tax fraud case. This argument ignores, however, that in

---

[4]As a preliminary matter, neither the magistrate judge's report nor the district court's order adopting the report explicitly addressed Teers's argument that the agents violated the IRS policy manual in failing to provide him <u>Miranda</u> warnings, which he raised in his post-hearing brief and his objections to the magistrate judge's report. Nevertheless, we may affirm the denial of a motion to suppress on any ground that finds support in the record. <u>Yeary</u>, 740 F.3d at 579 n.25.

reviewing the ruling on a motion to suppress, we construe all facts in the light most favorable to the party that prevailed in the district court. See Lewis, 674 F.3d at 1303. Here, Agent Caldwell testified unequivocally that Teers was not a suspect in the tax investigation of Hulse, that Caldwell investigated only tax crimes, and that he was not working with the FBI at any time with regard to an investigation of Hulse. And Agent Caldwell did not consider Teers to become a subject of the investigation based on Agent Duncan's comment that Teers could be committing bank or wire fraud. Teers's argument that he was a suspect fails.

Teers also makes a passing reference asserting he was "a witness" who was making self-incriminating statements within the meaning of the IRS policy manual.[5] The record shows, however, that during the IRS interviews, Teers made no statements that were at the time incriminating that triggered the agents' obligation under the IRS policy manual to advise Teers of his Miranda rights. As to the February 2005 interview, the loan solicitations in which Teers was later implicated did not even come up. And, during the June 2005 interview, Teers denied participating in any fraud with Hulse, including denying that he was telling financial institutions that Hulse owned bonds or that he was aware that Hulse was representing that he owned bonds that could be used as collateral. Although Teers's admission that he was providing Hulse with the bond listings later became

---

[5]The government does not address Teers's passing reference that he was considered a witness under the IRS manual.

27

incriminating, when Hulse and Teers's full scheme involving bank and wire fraud came to light, Teers's statements at this June 2005 time would not have required the agents, who were investigating tax fraud on the part of Hulse, to advise Teers of his rights pursuant to the manual's provision on non-custodial interviews of witnesses.

Turning to the second issue, even if Teers was "a subject" or "a witness" under the IRS policy manual, and even assuming the IRS agents should have given Teers his Miranda warnings, Teers must also show that the IRS's violation of its internal rule requires that his interview statements be suppressed or excluded in his criminal trial.  Teers argues that exclusion was appropriate on any of three grounds: (1) because any violation of an internal agency policy per se required exclusion of interview evidence; (2) because the agents' failure to provide him Miranda warnings violated his constitutional rights under the Fifth Amendment; or (3) because the agents' failure to follow an IRS policy violated his due process rights under United States v. Heffner, 420 F.2d 809 (4th Cir. 1969).

In response, the government argues that (1) federal courts do not suppress evidence obtained in violation of a law enforcement agency's internal procedures absent a constitutional violation; (2) the IRS agents did not violate Teers's constitutional rights by failing to advise him of his Miranda rights because he was not in custody; and (3) the Fourth Circuit's Heffner is not the law of this circuit

28

and, in any event, is no longer good law after the Supreme Court's decision United States v. Caceres, 440 U.S. 741, 99 S. Ct. 1465 (1979).  Before turning to these arguments, we pause to discuss United States v. Caceres, which governs the outcome of this issue as to all three of Teers's arguments.

In Caceres, the defendant, criminally charged with bribing an IRS agent, argued that tape recordings of his conversations with the bribed agent should be suppressed because the IRS had not secured the proper authorizations, required by regulations in the IRS manual, for monitoring and recording the conversations. 440 U.S. at 743, 99 S. Ct. at 1467.[6]  While the district court and the Ninth Circuit both agreed that suppression was an appropriate remedy for the violations of IRS policy, the Supreme Court reversed, concluding that suppression should not have been granted because neither the monitoring and recording nor the violations of IRS regulations violated the defendant's constitutional rights.  Id. at 743-44, 754-55, 99 S. Ct. at 1467, 1473.  First, the IRS "was not required by the Constitution or by statute to adopt any particular procedures or rules before engaging in

---

[6]Specifically, the IRS manual required the monitoring of non-telephone conversations to receive approval at the regional level as well as the national level by the Department of Justice ("DOJ"), except in emergency situations, in which the Director of Internal Security Division could authorize a recording.  Caceres, 440 U.S. at 746, 99 S. Ct. at 1468.  In Caceres, the monitoring agents had obtained emergency approval from the Director of Internal Security, but not from the DOJ, to monitor and record in-person meetings between the defendant and the bribed agent.  Id. at 747-48, 99 S. Ct. at 1469.  The Ninth Circuit found that the monitoring had not been done in accordance with the IRS regulations because (1) DOJ approval had not been secured and (2) the monitored meetings did not fall within the emergency provision of the regulations because the exigencies were the product of "government-created scheduling problems."  Id. at 748-49, 99 S. Ct. at 1470.

29

consensual monitoring and recording,"[7] id. at 749-50, 99 S. Ct. at 1470, and thus, the monitoring and recording did not on their own violate the defendant's constitutional rights, id. at 744, 99 S. Ct. at 1467. Second, as to whether the violations of the IRS regulations ran afoul of the defendant's constitutional rights, "the violations of agency regulations . . . [did] not raise any constitutional questions" because neither equal protection nor due process was implicated. Id. at 751-53, 99 S.Ct. at 1471-72. More specifically as to due process, the defendant could not "reasonably contend that he relied on the regulation, or that its breach had any effect on his conduct." Id. at 753, 99 S. Ct. at 1472.

Applying Caceres, we examine each ground on which Teers suggests that he was entitled to exclusion of his statements in the IRS interviews. First, to the extent that Teers argues that the agents' violation of the IRS policy manual should have per se resulted in exclusion, this argument is clearly foreclosed by Caceres, in which the Supreme Court noted that "a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures." Id. at 755-56, 99 S. Ct. at 1473. As the Supreme Court observed, "it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous

---

[7]The monitoring and recording were considered "consensual" because, while the defendant had not consented, the bribed agent had consented. See Caceres, 440 U.S. at 744, 99 S. Ct. at 1467 ("Neither the Constitution nor any Act of Congress requires that official approval be secured before conversations are overheard or recorded by Government agents with the consent of one of the conversants.").

administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form." Id. at 756, 99 S. Ct. at 1474. Thus, Teers was not per se entitled to exclusion of the statement evidence based on the agents' failure to follow the IRS manual absent a constitutional violation.

Second, to the extent that Teers suggests that the agents' failure to advise him of his Miranda rights in of itself violated his constitutional rights, entitling him to exclusion, Caceres also forecloses this argument. Specifically, to the extent that the IRS "was not required by the Constitution or by statute" to adopt a rule that the agents were required to provide Teers his Miranda warnings in a non-custodial setting, the agents' failure to provide him the warnings did not on its own violate his constitutional rights. See id. at 749-50, 99 S. Ct. at 1470. The IRS was not constitutionally required to adopt the manual provisions at issue here, as the Supreme Court has held that IRS agents investigating criminal income tax violations are not required under the Constitution to advise taxpayers of their Miranda rights in non-custodial interviews. See generally Beckwith v. United States, 425 U.S. 341, 96 S. Ct. 1612 (1976). Therefore, because the Constitution did not require the IRS agents to advise Teers of his Miranda rights, as he was not

31

in custody,[8] exclusion does not result simply from the agents' failure to advise him of his rights.

Third, as to Teers's claim based on the Fourth Circuit's Heffner that exclusion should result from a due process violation, Teers has failed to show a due process violation occurred in this case based on the IRS agents' failure to follow their agency's internal policy. As an initial matter, it is unclear to what extent, if any, Heffner survived Caceres. In Heffner, the Fourth Circuit held that the district court should not have admitted, at the defendant's criminal trial, the statements the defendant made during an IRS interview after the interviewing agents failed to provide him Miranda-like warnings required by an internal IRS policy. Heffner, 420 F.2d at 810-12. Relying on the Accardi doctrine, the Fourth Circuit held that "[a]n agency of the government must scrupulously observe rules, regulations, or procedures which it has established," and "[w]hen it fails to do so, its action cannot stand and courts will strike it down" as violative of due process. Id. at 811 (citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S. Ct. 499 (1954)).

However, even assuming that Heffner survived Caceres to the extent that Heffner indicated that suppression may be appropriate where an agency's failure to

---

[8]See discussion supra Part III.A.

follow its own regulations amounts to a due process violation,[9] Teers's briefs have not developed any argument as to how there was a due process violation under the specific facts of this case.  In other words, despite repeatedly contending that the IRS agents' failure to follow the policy manual violated due process, Teers does not allege, much less show, that due process was implicated "because [he] reasonably relied on agency regulations promulgated for his guidance or benefit and . . . suffered substantially because of their violation by the agency."  Caceres, 440 U.S. at 752-53, 99 S. Ct. at 1472; see also Heffner, 420 F.2d at 813 (noting the possibility that, if the Miranda-like warnings properly had been provided, the "defendant, alerted to the prosecutorial purpose of the interview, would have requested counsel").  As Teers has failed to present any clear argument showing reliance or prejudice, he has not shown a due process violation.

Regardless, we ultimately need not resolve whether a due process violation may have happened here or whether suppression may result from an agency's violation of due process by not following its own internal regulations, because any error in the denial of Teers's motion to suppress was harmless.  Although at trial Agent Duncan testified that Teers admitted to providing Hulse with the bond

[9]Although the government cites multiple cases in which federal courts refused to suppress evidence or dismiss an information based on an agency's violation of a regulation, the circuit court in each of those cases specifically concluded that either no due process issue was raised or a due process violation had not been shown.  See United States v. Thompson, 936 F.2d 1249, 1251 (11th Cir. 1991); United States v. Cormier, 639 F.2d 1177, 1180 (5th Cir. 1981); United States v. Rutherford, 555 F.3d 190, 198 (6th Cir. 2009); United States v. Kontny, 238 F.3d 815, 819 (7th Cir. 2001).

33

listings, thereby providing a link between Teers and Hulse's scheme, there is not a reasonable probability that this testimony contributed to the jury's verdicts in light of the other overwhelming evidence presented at trial. For example, this testimony was cumulative to Crouch's testimony that Teers represented that he was Hulse's broker and managed Hulse's bond portfolio, and documentary evidence showing that pages of printouts from the Bloomberg system faxed by Hulse to a potential lender appeared to include Teers's name as the original sender. Above we have recounted other evidence establishing Teers's guilt, such as the pledge agreements for the loans signed by him and testimony concerning his participation in the June 2007 conference call with the Bank.

## C.    Limitations on Cross-Examination

Teers argues that the magistrate judge abused his discretion in preventing Teers's counsel from examining Hulse on the nature and subject matter of the investigation for which Teers was interviewed, Teers's relationship to the subject matter, why Teers was interviewed, and how the interview related to the tax investigation of Hulse. Teers contends that his status as "a suspect" of an IRS investigation was relevant to his rights under the manual, and the magistrate judge should have allowed him to establish through his examination of Agent Caldwell that he was indeed such a suspect in order to show that he was entitled to be informed of his Miranda rights under the IRS policy manual.

We leave determinations of the admissibility of evidence to the discretion of the district court, and we will not be reverse unless we find an abuse of discretion. United States v. Miles, 290 F.3d 1341, 1351 (11th Cir. 2002). Moreover, we will not reverse if an error in the admission of evidence had no substantial influence on the outcome of the proceeding. United States v. Gunn, 369 F.3d 1229, 1236 (11th Cir. 2004). Finally, "[a] district court judge has wide discretion in managing the proceedings . . . [and] he may comment on the evidence, question witnesses, elicit facts not yet adduced or clarify those previously presented, and maintain the pace of a trial by interrupting or cutting off counsel as a matter of discretion." United States v. Day, 405 F.3d 1293, 1297 (11th Cir. 2005) (quotation omitted).

We find no abuse of discretion, and certainly no harmful error, in the magistrate judge's limitations on Teers's examination of Agent Caldwell. Although the magistrate judge placed some limits on Teers's line of questioning, Teers was permitted to question Caldwell on all of the subjects that he contends on appeal were relevant to establishing whether he was "a suspect" within the meaning of the IRS manual. Specifically, through Caldwell's testimony, Teers introduced evidence that the IRS was investigating Hulse for a possible tax code violation, that Teers was considered a witness but not a suspect in this investigation, and that the IRS agents believed that Teers might have information relevant to the Hulse investigation. Moreover, Teers repeatedly was permitted to

35

question Caldwell concerning whether the IRS agents considered Teers "a suspect," and Caldwell testified unequivocally that Teers was not a suspect. Thus, the record does not indicate that permitting further examination on this subject would have yielded any testimony from Caldwell suggesting that Teers was actually a suspect.

**D.      Magistrate Judge's Consideration of IRS Manual**

Teers also argues that the magistrate judge abused his discretion in not admitting and considering the IRS policy manual, which he contends was relevant to whether the IRS violated his due process rights by not following its own policies.

Although the magistrate judge's report did not discuss the IRS manual or Teers's argument that the IRS agents failed to follow the manual, the magistrate judge did admit the manual, contrary to Teers's suggestion. The magistrate judge noted his belief that the manual was irrelevant, but admitted it for purposes of the record and permitted Teers to argue in closing the relevancy of the IRS manual and its application to Teers's interviews. Thus, we find no abuse of discretion.

## IV.  SUFFICIENCY OF THE EVIDENCE

We review <u>de novo</u> whether sufficient evidence supports a jury's verdict in a criminal trial, taking the evidence in the light most favorable to the government. <u>United States v. Maxwell</u>, 579 F.3d 1282, 1299 (11th Cir. 2009). Therefore, we

resolve any conflicts in favor of the government, draw all reasonable inferences that tend to support the prosecution's case, and assume that the jury made all credibility choices in support of the verdict. Id. "Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." Id. (quotation omitted). The defendant, in rebutting the government's evidence, may not simply put forth a reasonable hypothesis of innocence, as the issue is not whether a jury reasonably could have acquitted but whether it reasonably could not have found guilt beyond a reasonable doubt. Id.

## A.    Aiding and Abetting Wire Fraud

Teers contends that the government presented insufficient evidence to support his convictions of aiding and abetting wire fraud in Counts 2, 5, 6, and 7 because the evidence did not show that he assisted in drafting or sending any of the faxes containing misrepresentations alleged in those counts in the indictment.

Our long-standing precedent holds "that a defendant may be convicted of mail fraud without personally committing each and every element of mail fraud, so long as the defendant knowingly and willfully joined the criminal scheme, and a co-schemer used the mails for the purpose of executing the scheme." United States

v. Ward, 486 F.3d 1212, 1222 (11th Cir. 2007) (footnote omitted).[10]  "'[S]o long as one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails.'"  Id. at 1223 (quoting United States v. Munoz, 430 F.3d 1357, 1369 (11th Cir. 2005)).  In Ward, this Court rejected the defendant's argument that insufficient evidence supported his mail and wire fraud convictions because "a defendant must either personally commit each element of mail and wire fraud, or at least aid and abet another in doing so."  Id. at 1222.  Noting that "'the law is clear that one need not personally mail or receive mail in order to be liable under mail fraud so long as co-schemers do so,'" this Court concluded that the government had presented sufficient evidence that the defendant knowingly and intentionally participated in a false and fraudulent scheme.  Id. at 1223-25 (quoting United States v. Funt, 896 F.2d 1288, 1294 (11th Cir. 1990)).

In this case, Teers's argument that insufficient evidence supported Counts 2, 5, 6, and 7—because the government did not show that he participated in drafting or sending the wire communications charged in those counts—is without merit.  As in Ward, the government here presented ample evidence to establish beyond a reasonable doubt that Teers knowingly and intentionally participated in Hulse's

---

[10]The mail, wire, and bank fraud statutes share the same relevant language, and thus, we apply cases construing any of these statutes here.  See Carpenter v. United States, 484 U.S. 19, 25 n.6, 108 S. Ct. 316, 320 n.6 (1987).

fraudulent scheme.  Specifically, the evidence showed that Teers represented to Crouch that he managed Hulse's substantial bond portfolio and supplied the bond listings that Hulse supplied to lenders in support of the false claim that Hulse owned bonds.  Additionally, Teers does not dispute that the faxes alleged in Counts 2, 5, 6, and 7 were sent in furtherance of this scheme.  Accordingly, because of his intentional participation in Hulse's scheme, Teers was liable for these uses of the wires, and sufficient evidence supported his convictions on Counts 2, 5, 6, and 7.

## B.    Bank Fraud

Teers also argues that insufficient evidence supported his conviction of aiding and abetting bank fraud in Count 10 because no evidence showed that he helped compose or send, or even knew of, the June 2007 letter sent by Mock and Hulse to the Bank that contained materially false statements.

In general, for a conviction under an aiding and abetting theory, the government must demonstrate that the defendant associated himself with a criminal venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed.  United States v. Joseph, 709 F.3d 1082, 1102 (11th Cir. 2013), cert. denied, 571 U.S. ___, 134 S. Ct. 1273 (2014).  "The evidence need not show that the defendant participated in every phase of the venture."  United States v. Howard, 13 F.3d 1500, 1502 (11th Cir. 1994).

As for a bank fraud conviction under 18 U.S.C. § 1344, "the government must show that the defendant (1) engaged in a scheme or artifice to defraud, or made materially false statements or representations to obtain moneys, funds or credit from; (2) a federally insured financial institution; and (3) that the defendant acted knowingly." United States v. De La Mata, 266 F.3d 1275, 1298 (11th Cir. 2001). Likewise, for a conviction of aiding and abetting bank fraud, the evidence must show that the defendant had the same willfulness and unlawful intent as the actual perpetrators of the fraud, that is, he acted with the intent to defraud. United States v. Williams, 390 F.3d 1319, 1324 (11th Cir. 2004). Although the government must demonstrate intent, it need not show that the defendant had knowledge of the particular means the principals employed to carry out the criminal activity. Id. at 1324 n.4.

Viewed in the light most favorable to the government, the evidence at trial was sufficient to support Teers's conviction on Count 10. Teers participated in the June 2007 conference call in which the Bank requested information on the allegedly-pending refinancing and an itemization of how the earlier loan proceeds had been used, and the jury could reasonably infer that Teers knew that Hulse would provide untruthful information to the Bank in response to this request. Moreover, for a conviction under an aiding and abetting theory, the government

40

was not required to show that Teers personally participated in making the false statement contained in the June 2007 letter.

## C.    Materiality of Misrepresentation

Teers also challenges the sufficiency of the evidence presented to support the materiality of the false statements alleged in the indictment, specifically, the March 2005, August 2005, and December 2005 misrepresentations.  Teers argues that no reasonable jury could have found that these statements or omissions constituted material misrepresentations.

The wire fraud statute prohibits, in relevant part, "any scheme or artifice to defraud" or to obtain money or property "by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  Similarly, the bank fraud statute, which was modeled on the mail and wire fraud statutes, proscribes "any scheme or artifice . . . to defraud a financial institution" or to obtain any property of a financial institution "by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1344; see also Neder v. United States, 527 U.S. 1, 20-21, 119 S. Ct. 1827, 1839 (1999).

The elements of wire fraud are: (1) intentional participation in a scheme to defraud, and (2) the use of the interstate wires in furtherance of that scheme. Maxwell, 579 F.3d at 1299.  For conspiracy to commit wire fraud, the government must show that a defendant "knew of and willfully joined in the unlawful scheme

to defraud; circumstantial evidence can supply proof of knowledge of the scheme."
Id.

Although neither the wire fraud statute nor the bank fraud statute explicitly contains a materiality element, the Supreme Court has held that materiality of falsehood is an element of the statutes. See Neder, 527 U.S. at 21-25, 119 S. Ct. at 1840-41 (explaining that Congress intended to incorporate the common-law meaning of "defraud," including its requirement of materiality, into the statutes). Specifically, "[a] scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." Maxwell, 579 F.3d at 1299. "A misrepresentation is material if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed." Id. (quotation and alteration omitted).

Put differently, a matter is material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question" or "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." Neder, 527 U.S. at 22 n.5, 119 S. Ct. at 1840 n.5 (quoting Restatement (Second) of Torts § 538 (1977)) (quotation omitted). The government need not prove "that a scheme to defraud would deceive persons of ordinary

42

prudence." United States v. Svete, 556 F.3d 1157, 1169 (11th Cir. 2009) (en banc). Indeed, even a defendant's misrepresentations that "would seem absurd or fanciful to a reasonable person" may be material because the wire and bank fraud statutes do "not require that every representation a defendant utters while executing his scheme must be credible." United States v. Gray, 367 F.3d 1263, 1268 (11th Cir. 2004) (examining mail fraud statute). Relatedly, the negligence of the victim in failing to discover a fraudulent scheme cannot be a defense to wire or bank fraud because "[a] perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence." Svete, 556 F.3d at 1165.

As to the March 2005 misrepresentation, Teers's statement to Crouch that Hulse owned a large bond portfolio was plainly material. A reasonable person in Crouch's position would have considered it important and relevant whether Hulse owned the large bond portfolio that would serve as collateral to the loan. Teers's arguments to the contrary wholly lack merit. Teers focuses on the fact that the indictment alleged that Teers referred to Hulse's "substantial" bond portfolio, while Crouch testified at trial that Teers referenced Hulse's "significant" bond portfolio, arguing that "substantial" and "significant" are not synonyms and that Teers did not say or mean that Hulse had a "substantial" bond portfolio. Regardless of whether Teers described the bond portfolio as substantial or significant, the statement was material insofar as it would be important to Crouch

43

in deciding whether to make the loan. Moreover, contrary to Teers's suggestion, it was irrelevant whether a reasonable lender, unlike Crouch, would have obtained Tri-Star bond account statements or financial statements from Hulse before recommending the loans. See id.; Gray, 367 F.3d at 1268.

We also conclude that sufficient evidence supported the materiality of the August and December 2005 misrepresentations. Teers argues that his failure to disclose the fact that H&H did not own the bonds (that were pledged as collateral for the loans) and intended to use the loan proceeds to buy the bonds (pledged as collateral) was immaterial because Crouch knew that H&H had no bonds in its account at the time of the first loan and that both loans would be used to purchase the bonds to be used as collateral. Teers points to evidence from which a jury possibly could infer that Crouch knew that H&H had no bonds in its account on the date the first loan closed and that bonds would be purchased with the proceeds from both loans. However, in considering Teers's sufficiency of the evidence challenge, we view the evidence in the light most favorable to the government and draw all reasonable inferences that tend to support its case. See Maxwell, 579 F.3d at 1299. In this light, a jury reasonably could infer from Crouch's testimony that he did not know that the loan proceeds would be used to purchase the bonds. Moreover, the evidence established that (1) H&H's bond portfolio was important to Crouch's decision to make the first loan; (2) the loan agreement required H&H

44

to deposit additional bonds in the event that the interest generated by the bond portfolio was not enough to make the quarterly loan payment; and (3) if Crouch had known that there was no bond portfolio and that Teers was not managing a bond portfolio for Hulse, he would not have pursued the loan.

## IV.  SENTENCING ISSUES

### A.    Number of Victims

Defendant Teers argues that the district court abused its discretion in applying the two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A) for an offense involving more than ten victims.  Teers contends that there was only one victim, the Bank, and that he could not have reasonably foreseen that other banks would participate in the loan.  Teers also asserts that he should not be punished for Crouch's separate negligent and criminal conduct in underwriting and participating out the loan, as Crouch's underwriting "did not meet normal or reasonable standards of underwriting."

We review de novo the district court's interpretation and application of the Guidelines, and for clear error its underlying factual findings, including its calculation of the number of victims.  United States v. Rodriguez, 732 F.3d 1299, 1305 (11th Cir. 2013).  Whether a person is a victim under the Sentencing Guidelines is a legal conclusion that we review de novo.  United States v. Ellisor, 522 F.3d 1255, 1275 (11th Cir. 2008).

45

Section 2B1.1(b)(2)(A), which applies to fraud offenses, calls for a two-level increase to a defendant's base offense level if his offense involved ten or more, but fewer than fifty, victims. Under the relevant Guidelines commentary, a "victim" is any person, including "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies," who "sustained any part of the actual loss . . . ." U.S.S.G. § 2B1.1 cmt. n.1. Thus, the Guidelines define the number of victims in relation to the loss calculation, and "actual loss" in turn is defined as "the 'reasonably foreseeable pecuniary harm that resulted from the offense.'" Ellisor, 522 F.3d at 1275 (quoting U.S.S.G. § 2B1.1 cmt. n.3(A)(i)).

The district court did not err in applying a two-level enhancement under § 2B1.1(b)(2)(A) to Teers's base offense level. Fifteen banks agreed to participate in the December 2005 loan to distribute the risk of loss as well as the chance of profit. When the loan turned out to be fraudulent, each "institution absorbed some level of principal loss" relative to its share of participation in the loan. As testimony established, institutions like the Bank routinely participate out portions of such large loans because they cannot bear the total loan individually. Thus, as an experienced broker, Teers reasonably could have foreseen that multiple banks or financial institutions would participate in the loan to share the risk of loss, and thereby become victims of the scheme when actual loss occurred. Cf. Ellisor, 522 F.3d at 1275 (rejecting defendant's argument that, when parents and students paid

46

money through 23 schools for a fake Christmas show, there were only 23 victims, and instead counting the parents and students as victims to conclude that there more than 2,700 victims of defendant's fraud).  Indeed, the loan documents in this case indicated that the Bank may issue participation interests to other entities. Finally, even if Crouch committed misconduct or negligence in his underwriting, Crouch's misconduct or negligence did not in any way change the reasonable foreseeability to Teers that the risk of such a large loan may be borne by multiple banks.

**B.    Minor Role Reduction**

Defendant Teers's final argument on appeal is that the district court clearly erred in refusing to grant him a two-level reduction under U.S.S.G. § 3B1.2(b) for being a minor participant in the criminal conduct.  Teers asserts that, compared to Hulse, who was the kingpin of the scheme, he played a minor role and received comparatively little money from the scheme.

We review for clear error, as a finding of fact, a district court's determination of whether a defendant qualifies for a minor role adjustment under the Guidelines.  United States v. Rodriguez De Varon, 175 F.3d 930, 934 (11th Cir. 1999) (en banc).  The defendant bears the burden of proving, by a preponderance of the evidence, that he is entitled to the reduction.  Id. at 939.

47

A two-level reduction in the offense level is appropriate when a defendant functions as a minor participant in the criminal activity. U.S.S.G. § 3B1.2(b). A minor participant is one "who is less culpable than most other participants, but whose role could not be described as minimal." Id. § 3B1.2(b) cmt. n.5. Two principles guide a district court's determination of a defendant's role in the offense: (1) the defendant's role in the relevant conduct for which he has been held accountable at sentencing; and (2) his role as compared to that of other participants in his relevant conduct. Rodriguez De Varon, 175 F.3d at 940. "[A] defendant is not automatically entitled to a minor role adjustment merely because [he] was somewhat less culpable than the other discernable participants. Rather, the district court must determine that the defendant was less culpable than most other participants in [his] relevant conduct." Id. at 944.

We find no error in the district court's determination that Teers was not entitled to a minor role reduction. First, Teers was a necessary participant in the scheme. Teers bolstered Hulse's false claim that Hulse owned a large amount of bonds by providing Hulse and the Bank with the Bloomberg shots of bonds purportedly owned by Hulse, by telling the Bank that he managed Hulse's "significant" bond portfolio, and by signing pledge agreements for both loans purporting that sufficient bond collateral existed to meet the pledge requirements. The Bank's belief that Hulse and H&H actually owned sufficient bonds to post as

48

collateral was necessary to secure the loans. Second, Teers's actions in furtherance of the scheme took place throughout the scheme's existence, and show that he was involved in and knowledgeable of the entire scope of the scheme. Specifically, Teers was present at the initial breakfast meeting with Crouch in March 2005, signed the Pledge Agreements for the loans in August and December 2005, and participated in the June 2007 conference call with the Bank. Thus, while Hulse may have received a greater financial benefit from the scheme than did Teers, the evidence showed Teers was a fully involved, necessary participant and no less culpable than his co-conspirators. See Rodriguez De Varon, 175 F.3d at 945-46.

## V.  CONCLUSION

For the foregoing reasons, we affirm Teers's convictions and sentences.

**AFFIRMED.**